Bradford L. **GAINES**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Southeastern Conference, and Vanderbilt University.**

No. 3:90–0773.

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 20, 1990.

---

Paul A. Alexis, Jeffrey S. Bivins, Boult, Cummings, Conners & Berry, Roger May, Dudley West, Nashville, Tenn., for Bradford L. Gaines.

Frank Bainbridge, Bruce Rogers, Birmingham, Ala., for Southeastern Conference.

William C. Barnard, Debra McVicker Lynch, Gayle A. Reindl, Indianapolis, Ind., for Nat. Collegiate Athletic Ass'n.

Steven A. Riley, Nashville, Tenn., John C. Callison, General Counsel, Vanderbilt University, Nashville, Tenn., for Vanderbilt University.

## MEMORANDUM

WISEMAN, Chief Judge.

This cause of action came before the Court on August 31, 1990, on Gaines' Application for Temporary Restraining Order

and Preliminary Injunction. This Court denied the Motion for a Temporary Restraining Order on that date. In the September 13 hearing on Gaines' Motion for a Preliminary Injunction, Gaines urged this Court to enjoin the Defendants from enforcing certain rules ("Rules") promulgated by the National Collegiate Athletic Association ("NCAA") which deem Gaines ineligible to compete in the 1990–91 college football season for Vanderbilt University ("Vanderbilt"). This Court denied the preliminary injunction from the bench and now issues this Opinion setting forth the reasons for the denial.

## I.

The facts leading to this lawsuit are not in dispute. Bradford L. Gaines was a football player for Vanderbilt during the 1986–89 football seasons. He is currently enrolled at Vanderbilt to complete the thirteen additional semester hours he needs to graduate. Gaines has attended Vanderbilt on a full athletic scholarship.

In late March of 1990, Gaines submitted a Petition For Special Eligibility and Renunciation of College Eligibility to the National Football League ("NFL") declaring himself eligible for the NFL draft to be conducted on April 22–23, 1990. The paragraph immediately preceding his signature on the Petition contained the following language: "I HEREBY IRREVOCABLY RENOUNCE ANY AND ALL REMAINING COLLEGE FOOTBALL ELIGIBILITY I MAY HAVE. I WISH TO BE ELIGIBLE FOR THE NFL DRAFT SCHEDULED FOR APRIL 22–23, 1990."

On April 7–8, 1990, Gaines attended a scouting combine in Indianapolis, Indiana.

The combine gave Gaines and other college football players a chance to try out before the scouts for various pro football teams. Gaines had no other contact with any NFL team prior to the draft, and he was not selected by any team during any round of the draft.

Shortly after the draft, Gaines was contacted by a representative of one NFL team regarding a possible free agency contract with that team. Mr. Tim Greer, who serves as the agent for Gaines' older brother, a football player in the Canadian Football League ("CFL"), briefly discussed this possible free agency contract with the NFL team. However, the next day the team let Gaines know that they were no longer interested in signing him to a free agency contract. Subsequently, Mr. Greer phoned numerous teams in the NFL and the CFL on Gaines' behalf, but Gaines has never entered into any contract with any professional team. Nor has Greer received any compensation of any kind from Gaines. Additionally, Greer has never compensated Gaines in any way.

As a result of NCAA Rules 12.1.1(f), 12.2.4.2, and 12.3.1, Gaines is now ineligible to complete his fourth year of eligibility as a football player at Vanderbilt. Rule 12.1.1(f) [1] provides that an athlete loses his amateur status when he enters a professional draft or enters into an agreement with an agent to negotiate a professional contract. Rule 12.2.4.2 [2], commonly known as the "no-draft" rule, makes a player ineligible for participation in a particular intercollegiate sport when he or she asks to be placed on the draft list or supplemental draft list of a professional league in that sport.

---

1. Rule 12.1.1(f) provides as follows:
   **12.1.1 Amateur Status.** An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
   \*   \*   \*   \*   \*   \*
   (f) Enters into a professional draft or an agreement with an agent or other entity to negotiate a professional contract.
2. Rule 12.2.4.2 provides as follows:
   **12.2.4.2 Draft List.** An individual loses amateur status in a particular sport when the indi-

vidual asks to be placed on the draft list or supplemental draft list of a professional league in that sport, even though:
(a) The individual asks that his or her name be withdrawn from the draft list prior to the actual draft,
(b) The individual's name remains on the list but he or she is not drafted, or
(c) The individual is drafted but does not sign an agreement with any professional athletics team.

Rule 12.3.1[3], commonly known as the "no-agent" rule, makes any player ineligible for participation in any future intercollegiate sport in which the player agrees, orally or in writing, to be represented by an agent for the purposes of marketing the player's abilities in the sport. This Rule applies even if the player receives no money or financial benefit of any kind from the agent, even if the agent is a family member or a close family friend, and even if the agent has not charged and agrees not to charge the player any fee.

## II.

In his Memorandum of Law in support of his application for a preliminary injunction, Gaines argues that the Defendants, by preventing college football players like himself from returning to college play for which they are otherwise eligible after an unsuccessful bid in the NFL draft, have engaged in an unlawful exercise of monopoly power in violation of 15 U.S.C. § 2.[4] Gaines cites 15 U.S.C. § 26, which provides that any party threatened with loss or damage by a violation of the antitrust laws may seek injunctive relief against the threatened conduct, as the basis for his injunction suit against the Defendants.

■ The parties agree on the four relevant factors this Court must consider in deciding whether to issue a preliminary injunction:

(1) whether a substantial likelihood exists that the party seeking the preliminary relief ultimately will succeed on the merits;

(2) whether it is likely that the party seeking preliminary relief will suffer immediate and irreparable harm if the relief is not granted;

(3) whether granting the relief would cause substantial harm to the other parties; and

(4) whether granting the preliminary relief would protect the public interest.

*American Motor Sales Corp. v. Runke*, 708 F.2d 202, 205 (6th Cir.1983). The parties also agree that the plaintiff bears the burden of proving each of these elements. Although the case law is clear that this Court should apply each of the four factors in a flexible manner, the likelihood of success on the merits factor is one of the most significant factors. *Gibson v. Sallee*, 648 F.Supp. 54, 56 (M.D.Tenn.1986) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir.1978)).

This Court recognizes that the plaintiff need only raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation" to satisfy the likelihood of success on the merits element. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir.1978); *Brandeis Machinery & Supply Corp. v. Barber–Greene Co.*, 503 F.2d 503, 505 (6th Cir.1974). However, as elaborated below, this Court has concluded that Gaines has not raised any question on the merits of his § 2 claim which presents a "fair ground for litigation." Consequently, because Gaines has failed to show a substantial likelihood that he ultimately will succeed on the merits, this Court must deny his application for a preliminary injunction.

Before analyzing the likelihood of success on the merits factor, however, it is important to point out the nature of the injunctive relief sought by Mr. Gaines and to emphasize the effect of this relief on the standards this Court must apply in determining whether to issue the injunction.

3. Rule 12.3.1 provides as follows:

**12.3.1 General Rule.** An individual shall be ineligible for participation in an intercollegiate sport if he or she ever has agreed (orally or in writing) to be represented by an agent for the purpose of marketing his or her athletics ability or reputation in that sport. Further, an agency contract not specifically limited in writing to a sport or particular sports shall be deemed applicable to all sports and the individual shall be ineligible to participate in any sport.

4. 15 U.S.C. § 2 provides the following:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...."

Despite the fact that Gaines requested relief in language suggesting the injunction would be merely prohibitory,[5] it is clear to this Court that Gaines really is seeking a mandatory injunction. As Defendant NCAA correctly argued (see NCAA's Memorandum In Opposition To Plaintiff's Request For Preliminary Injunction, p. 6 n. 4), Gaines seeks a preliminary injunction to force the NCAA and Vanderbilt to do an affirmative act—the NCAA to restore his eligibility and Vanderbilt to allow him to participate in its football program this season—not to preserve the status quo.

■ Because Gaines is requesting mandatory relief which would change the status quo, he bears an especially heavy burden in convincing the Court that an injunction is appropriate. The United States Court of Appeals for the Sixth Circuit has explained that where "[t]he relief prayed for ... is much broader than a mere restraining order preserving the status quo" and there is "sufficient doubt about whether appellant will ultimately prevail", granting a mandatory injunction is inadvisable. See Dunn v. Retail Clerks International Ass'n, Local 1529, 299 F.2d 873 (6th Cir. 1962). This Court agrees that it is inappropriate to give a party relief on the "front end" where sufficient doubt exists as to the party's ultimate chance of prevailing, especially where the relief sought preliminarily is the ultimate relief requested and where that relief is mandatory in nature.

Several courts in other circuits have ruled in accord more recently. See United Steelworkers of America v. Textron, Inc., 836 F.2d 6, 10 (1st Cir.1987) (courts disfavor injunctions that disturb, rather than preserve, the status quo; however, it is appropriate to issue an injunction which changes the "just previous" status quo when the injury to the seeking party is "serious enough," the absence of harm to the opposing party is "clear enough," and the seeking party's likelihood of success is "great enough."); Committee of Cent.

American Refugees v. I.N.S., 795 F.2d 1434, 1441 (9th Cir.1986) (where a plaintiff seeks a mandatory preliminary injunction "that goes beyond maintaining the status quo pendente lite, 'courts should be extremely cautious' about issuing a preliminary injunction and should not grant such relief unless the facts and law clearly favor the plaintiff." (quoting Martin v. International Olympic Committee, 740 F.2d 670, 675 (9th Cir.1984))); Diaz v. I.N.S., 648 F.Supp. 638, 656 (E.D.Cal.1986) (the burden of the plaintiff "increases sharply" in seeking mandatory relief; standards for such relief are "stringent").

As detailed below, this Court has concluded that Gaines has not met his burden of proving the likelihood of success on his § 2 claim.

### III.

■ In evaluating Gaines' proof of a § 2 violation, this Court must determine whether he has shown that enforcement of the NCAA Rules constitutes an unlawful exercise of monopoly power by the NCAA. The courts are clear on what an unlawful monopoly under § 2 consists of:

(1) the possession of monopoly power in the relevant market and

(2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Beard v. Parkview, 912 F.2d 138 (6th Cir. 1990) (quoting United States v. Grinnell, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)).

However, before focusing on the two-prong test, the Court must determine whether the eligibility Rules implemented by Vanderbilt and other NCAA schools are subject to federal antitrust law.

---

**5.** Gaines' Complaint prays for the following relief:

  B. That the Court issue an injunction restraining the Defendants from enforcing NCAA Rules 12.1.1(f), 12.2.4.2, and 12.3.1 in a manner which declare the Plaintiff ineligible from competition as a member of the Vanderbilt University football team during the coming season.

Plaintiff's Complaint at p. 7.

## A.

The federal antitrust laws seek to prevent restraints on "free competition in businesses and commercial transactions." *Hennessey v. NCAA*, 564 F.2d 1136 (5th Cir.1977) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940)). The Defendants argue that the NCAA Rules are not subject to antitrust analysis because they are not designed to generate profits in a commercial activity but to preserve amateurism by assuring that the recruitment of student athletes does not become a commercial activity. *See* Vanderbilt University's Brief In Support Of Motion To Dismiss And Response In Opposition To Application For Preliminary Injunction, p. 4. This Court agrees with the Defendants on this point.

There is no dispute that "[w]hile organized as a non-profit organization, the NCAA—and its member institutions—are, when presenting amateur athletics to a ticket-paying, television-buying public, engaged in a business venture of far greater magnitude than the vast majority of 'profit-making' enterprises." *Hennessey*, 564 F.2d at 1149 n. 14. The United States Supreme Court has recognized that the NCAA's television restrictions are subject to antitrust scrutiny because those regulations are commercial in nature. *See NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (holding NCAA's television restrictions violated § 1 of the Sherman Act).

However, there is a clear difference between the NCAA's efforts to restrict the televising of college football games and the NCAA's efforts to maintain a discernible line between amateurism and professionalism and protect the amateur objectives of NCAA college football by enforcing the eligibility Rules. The U.S. Supreme Court recognized as much in the *Board of Regents* case:

> The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, *the eligibility of participants,* or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.

*Board of Regents*, 468 U.S. at 117, 104 S.Ct. at 2968 (emphasis added). Although the U.S. Supreme Court did not state that eligibility rules were not subject to antitrust scrutiny, it cited a case with approval, *Jones v. NCAA*, 392 F.Supp. 295 (D.Mass. 1975), which stated exactly that. *See Board of Regents*, 468 U.S. at 102 n. 24, 104 S.Ct. at 2961 n. 24.

In *Jones* a college hockey player sought restoration of his eligibility for intercollegiate competition after it was discovered that he had received compensation for playing hockey before his college enrollment. The court upheld the eligibility Rules under §§ 1 and 2 of the Sherman Act, reasoning that the antitrust laws are aimed primarily at combinations with commercial objectives and have limited application to other types of organizations. The court concluded that the plaintiff had "not shown how the action of the N.C.A.A. in setting eligibility guidelines ha[d] any nexus to commercial or business activities in which the defendant might engage," *Id.* at 303, and that "the N.C.A.A. eligibility rules were not designed to coerce students into staying away from intercollegiate athletics, but to implement the N.C.A.A. basic principles of amateurism." *Id.* at 304.

This distinction between commercial NCAA rules and primarily noncommercial rules was clearly set forth in *Justice v. NCAA*, 577 F.Supp. 356 (D.Ariz.1983). The court pointed out that the NCAA now engages in two types of rule-making—"[o]ne type, exemplified by the rules in *Hennessey* [rule limiting number of assistant coaches employable at any one time by certain member institutions] and *Jones* [eligibility rule] is rooted in the NCAA's concern for the protection of amateurism; the other type is increasingly accompanied by a discernible economic purpose [citing *Board of Regents*]." *Id.* at 383. The court upheld the rules at issue (NCAA sanctions rendering the University of Arizona football team ineligible to participate in post-

season competition) as being of the former type. *Id.*

The United States Court of Appeals for the Fifth Circuit also has indicated that the NCAA has "some support in the caselaw" (citing to *Jones* and *Justice*) for its argument that the eligibility Rules are not subject to the antitrust laws because these Rules have "purely or primarily noncommercial objectives." *McCormack v. NCAA*, 845 F.2d 1338, 1343 (5th Cir.1988). The Fifth Circuit decided the case by assuming that the antitrust laws apply to eligibility rules, and by then finding that the NCAA rules restricting benefits to be awarded to student athletes were reasonable and thus did not violate § 1 of the Sherman Act.[6]

This Court agrees with the Fifth Circuit in *Hennessey* that the NCAA, with its multimillion dollar annual budget, is engaged in a business venture and is not entitled to a *total* exemption from antitrust regulation on the ground that its activities and objectives are educational and are carried on for the benefit of amateurism. *See Hennessey*, 564 F.2d at 1148–49. However, by holding that the eligibility Rules challenged by Gaines are not subject to antitrust analysis, this Court is by no means creating a total exemption, but rather a very narrow one. Justice White's dissenting opinion in *Board of Regents* provides support for this position: "Although the NCAA does not enjoy blanket immunity from the antitrust laws, [citations omitted] it is important to remember that the Sherman Act 'is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations ... which normally have other objectives.'" *Board of Regents*, 468 U.S. at 133, 104 S.Ct. at 2977 (White, J., dissenting) (quoting *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710 n. 7, 3 L.Ed.2d 741 (1959)).

The United States District Court for the Northern District of Indiana very recently ruled, in a case with facts strikingly similar to those presently before this Court, that it was "unwilling to rely on a single district court opinion [*Jones v. NCAA*] for the conclusion, sought by the NCAA, that the antitrust laws have no application to NCAA regulations concerning eligibility." *Banks v. NCAA*, 746 F.Supp. 850, 857 (N.D.Ind. 1990). As detailed above, this Court has found more than a single opinion on which to base its conclusion.

According to the NCAA Constitution, the purposes of the NCAA eligibility Rules are to maintain amateur intercollegiate athletics "as an integral part of the educational program and the athlete as an integral part of the student body and by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." Defendant NCAA's Memorandum In Opposition To Plaintiff's Request For Preliminary Injunction, p. 23 (quoting Purposes and Fundamental Policy of the NCAA, Article One of NCAA Constitution). The overriding purpose of the eligibility Rules, thus, is not to provide the NCAA with commercial advantage, but rather the opposite extreme—to prevent commercializing influences from destroying the unique "product" of NCAA college football. Even in the increasingly commercial modern world, this Court believes there is still validity to the Athenian concept of a complete education derived from fostering full growth of both mind and body. The overriding purpose behind the NCAA Rules at issue in this case is to preserve the unique atmosphere of competition between "student-athletes." This Court, therefore, rejects the notion that such Rules may be judged or struck down by federal antitrust law.

For the foregoing reasons this Court concludes that denial of Gaines' Application

---

6. The D.C. Circuit also has cited *Jones* with approval. In *Ass'n For Intercollegiate Ath. For Women v. NCAA*, 735 F.2d 577 (D.C.Cir.1984), the court, qualifying somewhat its position on the applicability of antitrust law to eligibility and similar rules, stated: "We do not assert that regulations governing noncommercial activity are exempt from the Sherman Act. Rather, we assert only that such regulations carry less potential of significantly restraining commerce than do regulations governing commercial activity." *Id.* at 588 n. 19.

For a Preliminary Injunction is proper because the eligibility Rules at issue are not subject to scrutiny under § 2 of the Sherman Act.

### B.

■ Notwithstanding the above conclusion, this Court, adopting an approach similar to the Fifth Circuit's in *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir.1988), will assume that the antitrust laws apply to the NCAA eligibility Rules and explain why Gaines has not shown a substantial likelihood of succeeding on the merits of his § 2 claim. As discussed above, Gaines must show both that the NCAA possesses monopoly power in the relevant market and that the NCAA has willfully acquired or maintained that power.

Monopoly power consists of "the power to control prices or exclude competition." *United States v. Grinnell*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Smith v. Northern Michigan Hospitals*, 703 F.2d 942, 954 (6th Cir.1983). The parties dispute the proper definition of the relevant market in which to measure the NCAA's alleged monopoly power. Gaines posits that the product market is one for "major college football player services," consisting of football players at schools in Division I–A of the NCAA. Plaintiff's Brief, p. 13. Assuming this is the relevant market, Gaines argues that the NCAA controls 100% of the market.

In contrast, the NCAA contends that the heart of Gaines' antitrust claim focuses on a different and broader market—the professional football recruitment market—by asserting that the Rules hamper competition between the NCAA and the NFL for the top college football players. Consequently, the NCAA argues that it does not have monopoly power over this broader market because it is *not capable of controlling prices or excluding competition* when the "buyers" in the market are not only the NFL and the NCAA, but also the Canadian Football League, the World League of American Football, and the Arena Football League. *See* NCAA's Memorandum, pp. 16–19.

This Court is hard-pressed to see any validity to the parties' interpretation of college football players like Brad Gaines as "sellers" and NCAA schools and professional football leagues or teams as "buyers" in an economic market. However, this Court sees no need to elaborate on the proper, if any, market definition because Gaines' proof is clearly insufficient as to the second element necessary to a § 2 claim.

■ After showing that a party possesses monopoly power in the relevant market, the plaintiff must show that the party has willfully acquired or maintained its monopoly power. *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04. The United States Supreme Court has summarized what a plaintiff must show to establish "willfulness" under § 2. Although in the case of an attempted monopolization the plaintiff must prove a specific intent to accomplish the "forbidden objective," in the case of an actual monopolization "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as *'exclusionary' or 'anticompetitive' or 'predatory'....*" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467 (1985) (emphasis added).

Thus, the critical question becomes whether the NCAA eligibility Rules are "unreasonably exclusionary" or "anticompetitive." Gaines argues that the Rules are unreasonably exclusionary because they permanently exclude him and others similarly situated from competing in major college football, because the Rules effectively discourage all major college football players from even attempting to see whether they could make it in the NFL, and because enforcement of the Rules consequently results in the NCAA keeping to itself the most talented of major college football players and enhancing its power with the great economic benefits derived from having the top athletes.

Gaines analogizes the NCAA practices at issue to refusals to deal and argues that, because the U.S. Supreme Court has repeatedly struck down arrangements in

which a firm with monopoly power refuses to deal with other firms in order to exclude them from business, this Court similarly should find that the NCAA is unlawfully excluding Gaines because he had contact with a "competitor," the NFL. Gaines also places emphasis on the fact that several NCAA committees and officials have recognized the Rules are restrictive and sometimes unfair and have proposed that college football players should be allowed to enter the professional draft without losing eligibility. *See* Supplemental Affidavit of Paul A. Alexis.

The Defendants, on the other hand, forcefully argue that they have a complete defense to any allegation of the exercise of monopoly power by the NCAA. The U.S. Supreme Court has stated that an entity with monopoly power does not violate § 2 by refusing to deal with a competitor if there are *valid business reasons* for the refusal. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597, 605, 105 S.Ct. 2847, 2854, 2858, 86 L.Ed.2d 467, 482 (1985). The Supreme Court approved the district judge's jury instruction on this issue, which said, in pertinent part, the following:

> 'In other words, if there were legitimate business reasons for the refusal, then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law. We are concerned with conduct which unnecessarily excludes or handicaps competitors. This is conduct which *does not benefit consumers by making a better product or service available*—or in other ways—and instead has the effect of impairing competition.'

*Id.* at 597, 105 S.Ct. at 2854–55, 86 L.Ed.2d at 477 (emphasis added).

This Court is convinced that the NCAA Rules benefit both players and the public by regulating college football so as to preserve its amateur appeal. Moreover, this regulation by the NCAA in fact makes a better "product" available by maintaining the educational underpinnings of college football and preserving the stability and integrity of college football programs.

Therefore, Gaines cannot succeed on the merits of his § 2 claim because the NCAA has shown legitimate business justifications for the Rules at issue.

It seems obvious to this Court that rules which are justified by legitimate business reasons necessarily cannot be deemed "unreasonably exclusionary" or "anticompetitive." Thus, the legitimate business reasons of the NCAA justifying enforcement of the eligibility Rules negate any attempt by Gaines to show the second element of a § 2 claim—willful maintenance of monopoly power. Consequently, regardless of whether the NCAA justifications are viewed as a defense to a § 2 challenge or rather as proof contradicting an assertion of willful monopolization, they necessitate a ruling by this Court in favor of the Defendants at this preliminary injunction stage of the proceeding.

■ The NCAA eligibility Rules have recently been upheld under § 1 of the Sherman Act. *Banks v. NCAA*, 746 F.Supp. 850 (N.D.Ind.1990). This Court realizes that the test for a § 1 violation is somewhat different than the two-prong test for a § 2 violation. In *Banks* the court upheld the Rules under the Rule of Reason, which requires the court to balance the procompetitive and anticompetitive effects of an alleged restraint and strike down the restraint if the anticompetitive effects predominate. *See Banks*, at 858. Although the Rule of Reason was developed specifically in § 1 cases, its focus on the reasonableness of a restraint on competition overlaps with the § 2 test for "willfulness" because in a § 2 case the court must also decide whether the regulation at issue is unreasonably anticompetitive. Thus, this Court agrees with the findings of the *Banks* court that the "no-agent" and "no-draft" Rules have primarily procompetitive effects in that they promote the integrity and quality of college football and preserve the distinct "product" of major college football as an amateur sport. Gaines would have us hold that a finding of *any* anticompetitive effect requires finding a § 2 violation. Gaines argues that such an effect is evident from the proposition that

the Rules deter many college players from even testing the professional waters. However, the proper inquiry is whether the Rules are unreasonably anticompetitive. This Court has concluded that the Rules are overwhelmingly procompetitive, are justified by legitimate business reasons, and consequently cannot be viewed as having any unreasonably exclusionary or anticompetitive effect.

The United States Supreme Court has expressly recognized the legitimate procompetitive effects of the eligibility Rules:

> [T]he NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.

*NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 101–02, 104 S.Ct. 2948, 2960–61, 82 L.Ed.2d 70, 84 (1984). The Supreme Court distinguished the NCAA television restrictions, which it invalidated under § 1, from "most of the regulatory controls of the NCAA [which] are justifiable means of fostering competition among amateur teams and therefore procompetitive because they enhance public interest in intercollegiate athletics." *Id.*, 468 U.S. at 117, 104 S.Ct. at 2969, 82 L.Ed.2d at 94. The only conclusion which this Court can reach in light of the Supreme Court's lan-

guage quoted above is that the Rules challenged by Gaines are not unreasonably anticompetitive.

### C.

Because this Court has determined that Gaines has failed to show a substantial likelihood of success on the merits, it is not necessary to discuss fully the other three elements relevant to a preliminary injunction determination.

This Court recognizes that Gaines is harmed more by a denial of his preliminary injunction request than if the injunction was issued. However, Gaines has not made a strong showing that he will suffer immediate and irreparable injury upon denial of his request. It is true he will not be able to play football for Vanderbilt this season. However, it is not true that his chances of playing professional football are irreparably foreclosed. Although his chances may be narrowed by his lack of college play this year, he himself has admitted that he has a good chance to play in some professional league (CFL, Arena Football, etc.). *See* Alexis Affidavit. Ex. 4.

Secondly, this Court must consider the hardship which likely would result to the Defendants were Gaines' request granted. This Court does not consider lightly a request which puts it in the position of substituting its judgment for the authority of a regulatory body, in this case the NCAA. This Court also is reluctant to blur the line further between professional and college football, especially because of the likely increased confusion among players and schools like Vanderbilt concerning the possible consequences of a player unsuccessfully entering the pro draft or a school letting such a player back into its program.

Finally, although there indeed is a strong public interest in encouraging free and open competition in the marketplace, with respect to the unique "marketplace" for college football, there are other strong interests to consider. The public interest is promoted by preserving amateurism and protecting the educational objectives of intercollegiate athletics. As the United

States Supreme Court has articulated, "the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act." *Board of Regents*, 468 U.S. at 120, 104 S.Ct. at 2970, 82 L.Ed.2d at 96.

### IV.

Despite the compelling situation which has befallen Mr. Gaines, he has failed to show a substantial likelihood of success on the merits of his § 2 claim. From the outset he shouldered a heavier burden because of the mandatory nature of the relief sought. However, this Court is convinced that Gaines has not carried even the lighter burden of establishing any fair ground for litigation of his claim. There is substantial support in the caselaw for this Court's conclusion that the NCAA eligibility Rules are not subject to antitrust scrutiny. Nonetheless, upon such scrutiny, it is clear to this Court that the NCAA has demonstrated strong business justifications for enforcing the current eligibility Rules, leading to the conclusion that the Rules cannot be deemed unreasonably anticompetitive or exclusionary.

For the foregoing reasons Gaines' Application For a Preliminary Injunction is denied.