ADIDAS AMERICA, INC., Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

No. Civ.A. 98–2510–GTV.

United States District Court, D. Kansas.

March 26, 1999.

Bruce Keplinger, Timothy S. Davidson, Norris and Keplinger, L.L.C., Overland Park, KS, Tracy M. Preston, Eric S Walters, Jackson, Tufts, Cole & Black, L.L.P., San Jose, CA, Susheela Jayapal, David M Howitt, adidas America, Inc., Beaverton, OR, David T. Alexander, Jesse W Markham, Jr, Jackson, Tufts, Cole & Black, L.L.P., San Francisco, CA, for Adidas America Inc., plaintiff.

Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Leawood, KS, Michael J. Davis, David E. Everson, Jr., Thomas P. Schult, Stinson, Mag & Fizzell, P.C., Kansas City, MO, Gregory L Curtner, Miller, Canfield, Paddock & Stone, P.C., Ann Arbor, MI, for National Collegiate Athletic Association, defendant.

## MEMORANDUM AND ORDER

VANBEBBER, District Judge.

This case is before the court on plaintiff Adidas America, Inc.'s ("Adidas") motion for a preliminary injunction. Adidas has filed this action for damages and injunctive relief against defendant National Collegiate Athletic Association ("NCAA") alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and state law claims of tortious interference with contractual relations, tortious interference with prospective economic advantage, breach of contract, and violations of public policy and NCAA bylaws and rules. Adidas seeks to enjoin the NCAA from enforcing NCAA Bylaw 12.5.5 against it until a trial on the merits. Bylaw 12.5.5 limits the size of advertising logos permitted to appear on student-athletes' uniforms and apparel during NCAA competitions. For the reasons set forth in this memorandum and order, Adidas' motion for a preliminary injunction (Doc. 3) is denied.

From February 1 to February 12, 1999, the court conducted an evidentiary hearing on Adidas' motion for a preliminary injunction. At the request of the parties, no closing arguments were heard by the court. On February 23, 1999, the parties submitted their findings of facts, conclusions of law, and post-hearing memoranda. The parties responded to the opposing party's submissions on March 2, 1999. After considering the testimony of witnesses, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

#### The Parties

The NCAA is a voluntary, unincorporated association of approximately 1,100 four-year colleges and universities, conferences, affiliated associations and other educational institutions. Adidas America, Inc. ("Adidas") is one of the United States' leading manufacturers of athletic footwear and apparel. Formed in 1992, Adidas is a subsidiary of Adidas–Salomon AG, a German company, which is the second largest sporting goods company in the world. Adidas currently contracts with NCAA member institutions and their coaches to advertise and promote its products.

#### Creation and Evolution of Bylaw 12.5.5

In 1977, the NCAA had no specific rule addressing a student-athletes' wearing of apparel or use of equipment that bore a manufacturer's logo or trademark. However, the NCAA Constitution prohibited student-athletes from promoting commercial enterprises. In 1978, a member institution questioned whether the wearing of a uniform bearing a manufacturer's logo

constituted the promotion of a commercial product. In response to this inquiry, the NCAA concluded that as long as the logo on the uniform was the same logo generally available on that product to the public, it would not be considered promotion of a commercial product. This rule applied to equipment as well as apparel.

The rule governing the use of logos on apparel changed in 1983. The precipitating event involved Patrick Ewing, a basketball player at Georgetown University. During a college basketball game, Ewing wore a Nike T-shirt under his uniform that bore Nike's logo on each shoulder. When the Ewing incident came to the attention of the NCAA Eligibility Committee, which is made up of representatives of member institutions, the committee reviewed the logo question to develop a new standard. In its 1984–85 Manual, the NCAA changed its existing logo rule and included a case study, known as Case No. 40, to explain the new rule's restrictions governing the size and number of logos that could be worn by collegiate athletes in NCAA competition.

The new rule continued to allow student-athletes to wear or use equipment that bore a manufacturer's normal logo, but it restricted the size and number of logos permitted on apparel worn by student-athletes. Specifically, a student-athlete's uniform could bear only a single manufacturer's logo not to exceed one and one-half inches in height or width. The new rule treated equipment and apparel differently because the Eligibility Committee, in creating the rule, was responding to the concerns created by the Ewing incident, which involved apparel and not equipment. Although this rule was framed as a case study, it had the force and effect of an NCAA bylaw. The case study was eventually codified as NCAA Bylaw 12.5.4.

In 1989, Bylaw 12.5.4 was amended to allow student-athletes to wear competition-identification materials such as football bowl-game patches that include the name of the event's sole corporate sponsor. The NCAA allowed the wearing of bowl-game patches even though they represented a second commercial logo on the uniform and routinely exceeded Bylaw 12.5.4's size restrictions.

In 1993, the NCAA formed the Special Committee to Review the Relationship of Apparel Manufacturers to the Intercollegiate Athletics Community (the "Special Committee"). When an issue arose over the application of Bylaw 12.5.4 to design elements on collegiate uniforms, the issue was sent to the Special Committee for its consideration. A design element is simply an aspect of the overall design of a piece of apparel. Design elements are relevant to this case because sports apparel manufacturers have attempted to circumvent the restrictions of Bylaw 12.5.4 by adding additional advertising on athletic apparel in the form of design elements that look similar to their logos or trademarks.

NCAA staff asked the Special Committee to determine whether the design element issue should be handled as an interpretation of the existing bylaw or as new legislation. The Special Committee decided that the issue should be addressed through an interpretation designed to confirm the original intent of Bylaw 12.5.4. In April 1994, the NCAA Council adopted the following interpretation of Bylaw 12.5.4:

> Design Elements Considered as Additional Logo: The Special Committee . . . recommends that the Council confirm that an institution's official uniform cannot bear a design element similar to the manufacturer's logo (e.g., Adidas soccer shirt bearing three descending stripes on the shirt's shoulder, Umbro soccer shirt with the Umbro diamond repeated around the rib knit collar) that is in addition to another logo or that is contrary to the size restriction of Bylaw 12.5.4–(b). It was VOTED "That the Council approve the committee's recommendation."

Bylaw 12.5.4 eventually became Bylaw 12.5.5.

After Bylaw 12.5.5 became the governing standard, the NCAA changed the pa-

rameters of the bylaw's size limitation. Finding no reason to limit a logo to a square shape, the NCAA changed the bylaw to allow logos to be any four-sided figure with an area not to exceed two and one-quarter square inches. In its current form, Bylaw 12.5.5 provides:

A student-athlete may use athletics equipment or wear athletics apparel that bears the trademark or logo of an athletics equipment or apparel manufacturer or distributor in athletics competition and pre- and postgame activities (e.g., celebrations on the court, pre- or postgame press conferences), provided the following criteria are met. [Violations of this bylaw shall be considered institutional violations . . .; however, they shall not affect the student-athlete's eligibility]:

(a) Athletics equipment (e.g., shoes, helmets, baseball bats and gloves, batting or golf gloves, hockey and lacrosse sticks, goggles and skis) shall bear only the manufacturer's normal label or trademark, as it is used on all such items for sale to the general public, and

(b) The student-athlete's institution's official uniform (including numbered racing bibs and warmups) and all other items of apparel (e.g., socks, head bands, T-shirts, wrist bands, visors or hats, swim caps and towels) shall bear only a single manufacturer's or distributor's normal label or trademark (regardless of the visibility of the label or trademark), not to exceed 2 ¼ square inches in area (i.e., rectangle, square, parallelogram) including any additional material (e.g., patch) surrounding the normal trademark or logo.

Effective August 1999, Division I off-field personnel attending NCAA champion-

ships will also be subject to the provisions of Bylaw 12.5.5. Off-field personnel include coaches, trainers, managers, cheerleaders, band members, dance team members, and mascots. The new sideline rule includes a provision allowing existing contracts between institutions and manufacturers that include logo specifications to be honored, provided they were in effect prior to August 11, 1998.

*Application of Bylaw 12.5.5 in General*

If a member institution is unsure about whether a uniform or piece of apparel complies with Bylaw 12.5.5, it may submit the garment to the NCAA's Member Services Group for review. When a garment clearly violates the bylaw, a single Membership Services representative may rule that it is not in compliance. In other situations, the determination of whether a submitted garment complies with the bylaw is made by a small informal group of Membership Services representatives or by the entire Membership Services staff at a formal meeting. If a uniform is rejected by a small number of Membership Services representatives, the member institution may take the issue to a formal staff meeting. If a member institution disagrees with an interpretation of the Membership Services staff, it can appeal to an interpretations committee in the appropriate division. If a school disagrees with the decision of the Division I Interpretations Committee, it can ask the Management Council to review that decision.[1] An appeal of a Membership Services staff interpretation regarding a uniform's compliance with 12.5.5 to the Interpretation Committee takes approximately two weeks. However, if the member institution disagrees with the final outcome of its appeal, it may propose new legislation to the NCAA. That process takes from six to nine months under the current system.[2]

---

1. The current appeal system utilizing the Management Council has only been in effect since 1996. However, there has been a right to appeal a decision of the Membership Services group since 1977.

2. Prior to January 1, 1998, if an appeal was denied by the Interpretations Committee, proposed legislation would not be considered by the NCAA until the next annual meeting in January of the following year.

Before the first size restriction on logos was adopted in 1983, Georgetown University appealed the Membership Services staff's decision that the Nike logos on Patrick Ewing's T-shirt amounted to the promotion of a commercial product. The appeal went to the NCAA Council and resulted in Case No. 40. There have been no appeals of the logo rule since. Furthermore, no member institution has ever appealed a staff interpretation of Bylaw 12.5.5 as it relates to design elements being similar to a manufacturer logo.

*Application of Bylaw 12.5.5 to Adidas*

One of Adidas' trademarks is three descending stripes down the sleeve or pant leg of a piece of apparel. As a result, the NCAA has repeatedly determined that Adidas' design elements consisting of three stripes or having a visual effect of three stipes are equivalent to a logo or trademark as defined by Bylaw 12.5.5. Therefore, an Adidas uniform bearing a three-stripe design element larger than two and one-quarter square inches, violates the bylaw. Furthermore, the NCAA considers such a design element to be a second manufacturer's logo or trademark; a uniform with two logos also violates the bylaw. If, however, the logo of a sports apparel manufacturer that does not have a three-stripe trademark appeared on the same three-striped uniform, the uniform would not violate Bylaw 12.5.5.

In 1993, a soccer uniform known as "Equipment A" was reviewed by the NCAA to determine if it was in compliance with Bylaw 12.5.4. The Equipment A uniform bore a small Adidas logo and three large stripes on the right shoulder. By letters dated October 26, 1993, the NCAA informed a number of member institutions that the uniform was in violation of Bylaw 12.5.4 because the three stripes on the uniform's shoulder resembled the Adidas corporate logo. Because of reactions by Adidas and member institutions using the Equipment A uniform, the NCAA reviewed its decision and concluded that the three stripes on the uniform's shoulder were of the same length and did not resemble Adidas' corporate logo. With the announcement of the 1994 design-element interpretation, however, the Equipment A uniform was again declared noncompliant by the NCAA.

In 1998, a second Adidas soccer uniform, the "Velez" jersey, was initially deemed compliant and later deemed noncompliant by the NCAA when it was determined that its striped design elements resembled the Adidas three-stripe trademark. Also in 1998, Adidas submitted a size medium "Team Stripe" jersey to the NCAA for approval. The NCAA concluded that, because the sleeve of the jersey had only two stripes, it complied with Bylaw 12.5.5. When the jersey was later seen by the NCAA in a size large, it was deemed in violation of the bylaw because the additional material for the sleeve in the large size caused a third stripe to become visible.

Because Bylaw 12.5.5 is enforced against the member institutions and not the apparel manufacturer, Adidas and other apparel manufacturers have no right or ability to appeal a Membership Services decision. However, Adidas may work through a member institution to appeal a decision of the Membership Services staff. Despite having this option, nothing in the record indicates that Adidas ever asked a member institution to appeal a decision of Membership Services.

Due to the NCAA's many adverse rulings on the legality of its apparel, Adidas' claimed that Bylaw 12.5.5 was illegal and that the NCAA was applying the bylaw unfairly. In September 1998, the NCAA's general counsel, in response to Adidas' concerns, offered to provide Adidas with an NCAA staff member who would review Adidas' proposed production line and give definitive answers as to whether particular designs violated Bylaw 12.5.5. Adidas chose not to accept the NCAA's offer.

*Purpose of Bylaw 12.5.5*

The purpose of Bylaw 12.5.5 is to preserve the integrity of college athletics and to avoid the commercial exploitation of stu-

dent-athletes. Furthermore, the bylaw is designed to avoid excessive advertising that could potentially interfere with the basic function of the student-athletes' uniforms, which is to provide immediate identification of the athlete's number and team to his or her teammates and to the referee or umpire officiating the contest.

There is no commercial purpose behind the creation and enforcement of Bylaw 12.5.5. Neither the NCAA nor its member institutions realize an economic or competitive advantage through the enforcement of Bylaw 12.5.5 against Adidas or other apparel manufacturers.

## CONCLUSIONS OF LAW

The main purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits in order for the trial court to render a meaningful decision. *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992). Because it is an "extraordinary remedy," the court will not issue a preliminary injunction unless the right to relief is "clear and unequivocal." *SCFC ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1098 (10th Cir.1991). "In determining whether a preliminary injunction is warranted, a court must be guided by normal equitable principles and must weigh the practicalities of the situation." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984).

In order to obtain preliminary injunctive relief, the moving party must demonstrate that: (1) it will suffer irreparable injury in the absence of an injunction; (2) the threatened injury to the moving party outweighs whatever damage the injunction may cause the opponent; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Chemical Weapons Working Group v. United States Dept. of the Army*, 111 F.3d

1485, 1489 (10th Cir.1997); *SCFC*, 936 F.2d at 1098–99. From the record before it, the court concludes that the preliminary injunction sought by Adidas will alter the status quo by enjoining NCAA member institutions from applying and enforcing Bylaw 12.5.5, which has been in effect since 1994. Because preliminary injunctions that alter the status quo are disfavored, Adidas has the burden of showing that, on balance, the four factors listed above "weigh heavily and compellingly in (its) favor" before the injunction will be issued. *See SCFC*, 936 F.2d at 1099.

The court concludes that Adidas has failed to carry its burden at this stage of the proceeding and has not established its right to preliminary injunctive relief. Specifically, Adidas has failed to show that it faces irreparable harm in the absence of a preliminary injunction or that there is a likelihood that it will eventually prevail on the merits of its claims. Because Adidas has failed to establish the first and fourth preliminary injunction factors, the remaining two factors need not be addressed.[3]

### I. IRREPARABLE HARM

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered . . . ." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed.1995). Preliminary relief will not be granted where (1) the alleged harms are speculative; (2) the applicant has an alternate remedy in the form of money damages or other relief; or (3) the harm complained of is self-inflicted by the applicant. *Id.*

Adidas claims that, without preliminary injunctive relief, it will suffer a diminution of its intellectual property, and injury to

3. Due to Adidas' failure to establish two of the preliminary injunction elements, the court would deny Adidas' request for preliminary injunctive relief even if the injunction sought was not disfavored, and Adidas' was not required to show that the four factors weigh heavily and compellingly in its favor.

its reputation, its relationships with member institutions, its processing and manufacturing partners, and the buying public. However, at the preliminary injunction hearing, Adidas offered only business speculation and conjecture to establish its irreparable injury. Such evidence "falls far short of the proof that is required to make a clear showing of irreparable injury." *SCFC*, 936 F.2d at 1100.

Adidas did not provide evidence sufficient to show that it has suffered irreparable injury in the past or that it is currently suffering irreparable injury. Adidas also failed to establish a likelihood that it will suffer irreparable harm in the future by continuing to adhere to the status quo. While Adidas presented testimony that it would suffer a diminution of its intellectual property, various reputation injuries, and a loss of sales due to Bylaw 12.5.5, the testimony was speculative and largely without factual support.

Adidas did present evidence that the NCAA applied Bylaw 12.5.5 in an arguably inconsistent and unpredictable fashion. However, Adidas failed to show that the NCAA's inconsistent or unpredictable application of the bylaw was intentional or that it resulted in irreparable harm. From the evidence presented, the court concludes that any harm resulting from the NCAA's application of Bylaw 12.5.5 to Adidas can be measured in and compensated by monetary damages.

The court also concludes that Adidas has placed itself in harm's way. The NCAA provides member institutions and, therefore, apparel manufacturers an opportunity to have their uniform and apparel designs reviewed before they are used in competition. Moreover, the general counsel for the NCAA offered to provide a staff member to Adidas to ensure Adidas' compliance with Bylaw 12.5.5. Adidas could have avoided the specter of much of its alleged irreparable harm by submitting its apparel designs, either directly or through member institutions, to Membership Services for prior approval, by accepting the NCAA's offer to provide a staff

member to ensure Adidas' compliance with Bylaw 12.5.5, or by choosing not to market apparel that clearly failed to comport with Bylaw 12.5.5's restrictions. Had Adidas made an attempt to comply with Bylaw 12.5.5 shortly prior to and during this litigation, it may have increased its design and production costs, but it could have avoided the alleged irreparable effects on its business, profits, or reputation. Even if the court were to conclude that Bylaw 12.5.5 is illegal or arbitrarily applied, preliminary injunctive relief would be inappropriate because any irreparable harm resulted from Adidas' willful failure to comply with the bylaw.

The court also finds that Adidas' delay in bringing this lawsuit undercuts its claim that the continued enforcement of Bylaw 12.5.5 will cause immediate and irreparable harm. *See Kansas Health Care Assoc. v. Kansas Dept. of Soc. and Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir.1994) ("As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."). From the record before it, the court concludes that the harm alleged by Adidas is either speculative, self-inflicted, or compensable in damages as part of a final judgment by a federal or state court. In any event, preliminary injunctive relief is not appropriate.

## II. LIKELIHOOD OF SUCCESS

■ Adidas claims violations of sections 1 and 2 of the Sherman Act, interference with contractual relations, interference with prospective economic advantage, breach of contract, and violations of NCAA bylaws and rules and public policy. The court concludes that Adidas has failed to establish a likelihood that it will prevail on the merits of its federal or state law claims.

### A. Antitrust Claims

■ Adidas claims that the NCAA has unreasonably restrained trade and engaged in a group boycott in violation of section 1 of the Sherman Act, and has

attempted to monopolize in violation of section 2 of the Sherman Act. To prevail on a section 1 claim, a plaintiff must prove that the defendant (1) participated in an agreement that. (2) unreasonably restrained trade in the relevant market. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.,* 899 F.2d 951, 959 (10th Cir. 1990). To prevail on a section 2 claim, a plaintiff must establish the following elements: (1) "the possession of monopoly power in the relevant market," and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). However, before analyzing the alleged antitrust violations under the above tests, the court must first determine the threshold issue of whether Bylaw 12.5.5 is properly the subject of federal antitrust law.

 The Sherman Act was created to prevent "restraints to free competition in businesses and commercial transactions which [tend] to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). While Congress used broad language in framing the potential scope of the Sherman Act, it did not intend for the Act to reach every activity that might affect competition or business. *See National Org. for Women, Inc. v. Scheidler,* 968 F.2d 612, 620 (7th Cir.1992) (finding that although national effort to close abortion clinics affected commerce, such activity was not subject to Sherman Act scrutiny), *rev'd on other grounds,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). "The Commerce power under

which [the antitrust] laws were enacted limits their jurisdiction to matters involving 'commerce,' . . . the drafters never intended to condemn properly defined non-commercial activities." IA Phillip Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 262, at 269 (1997).

Accordingly, a number of federal circuit courts have recognized that the noncommercial activities of certain organizations are outside the scope of the antitrust laws.[4] *See, e.g., Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,* 156 F.3d 535, 540–41 (4th Cir.1998) (finding that a straightforward interpretation of the Sherman Act indicates that noncommercial activities of nonprofit organizations are not subject to antitrust liability); *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63–66 (2d Cir.1997) (recognizing that if the nature of an activity is noncommercial and has only incidental effects on commerce, antitrust law does not apply); *Dedication and Everlasting Love to Animals v. Humane Soc'y,* 50 F.3d 710, 712 (9th Cir.1995) (refusing to apply antitrust laws to solicitation of contributions by charity); *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schs., Inc.,* 432 F.2d 650, 654 (D.C.Cir.1970) (refusing to apply antitrust laws to defendant's eligibility restrictions admitting only nonprofit educational institutions despite incidental restraints on trade). In *Marjorie Webster Junior College,* the D.C. Circuit determined that the defendant's eligibility restrictions were outside the scope of the antitrust laws because they were not commercially motivated; they were "distinct from the sphere of commerce;" and they concerned the "heart of the concept of education itself." 432 F.2d at 654–55. In *Smith v. NCAA,* the Third Circuit adopted

---

4. The Tenth Circuit has not addressed this issue. In *Law v. NCAA,* the court held that horizontal price-fixing agreements among NCAA members should be analyzed under the rule of reason rather than the per se rule. 134 F.3d 1010, 1018–19 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 65, 142 L.Ed.2d

51 (1998). The court did not, however, provide any guidance on drawing lines between those agreements properly defined as commercial activities and those considered noncommercial and, therefore, not subject to the antitrust laws.

a similar commercial/noncommercial analysis to determine whether the NCAA's eligibility requirements were subject to antitrust law. 139 F.3d 180, 185–86 (3d Cir. 1998), *vacated on other grounds*, —— U.S. ——, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999) (rejecting Third Circuit holding that NCAA's receipt of dues from federally funded member institutions brings NCAA within scope of Title IX). The plaintiff in *Smith* claimed that the NCAA's rule prohibiting graduate students from competing for schools other than those schools from which the students received their undergraduate degrees violated the Sherman Act. Because the NCAA's eligibility rule in question was designed to ensure fair competition in intercollegiate athletics, and was not intended to provide the NCAA with a commercial advantage, the court concluded that the rule was not subject to the antitrust laws. *Id.* at 185.

Prior to and after the *Smith* decision, a number of federal district courts reached the same conclusion as the Third Circuit when determining whether an activity of the NCAA was within the scope of federal antitrust law. *See, e.g., Bowers v. NCAA*, 9 F.Supp.2d 460, 497 (D.N.J.1998) (holding that, under *Smith*, the NCAA's eligibility rules are not related to NCAA's commercial or business activities and, therefore, not subject to antitrust laws); *Gaines v. NCAA*, 746 F.Supp. 738, 744–46 (M.D.Tenn.1990) (holding that NCAA's efforts to maintain amateurism by enforcing its eligibility rules are not subject to antitrust laws); *Jones v. NCAA*, 392 F.Supp. 295, 303 (D.Mass.1975) (holding that antitrust law does not apply to NCAA eligibility rules); *College Athletic Placement Serv., Inc. v. NCAA*, No 74–1144, 1974 WL 998, *4–5 (D.N.J. August 22, 1974) (holding antitrust law does not apply to NCAA rule rendering ineligible for competition student-athletes who utilized plaintiff's athletic scholarship finding service), *aff'd* 506 F.2d 1050 (3d Cir.1974) (table). In *Gaines*, the plaintiff challenged the NCAA's rules that strip a student-athlete of his amateur status if he enters a professional sports draft or enters into an agreement to negotiate with a professional agent. 746 F.Supp. at 740. The *Gaines* court began its analysis by acknowledging that while some of the NCAA's acts are commercial in nature and subject to Sherman Act scrutiny, others are not:

> [T]here is a clear difference between the NCAA's efforts to restrict the televising of college football games and the NCAA's efforts to maintain a discernible line between amateurism and professionalism and protect the amateur objectives of NCAA college football by enforcing the eligibility Rules. The U.S. Supreme Court recognized as much in the *Board of Regents*[5] case:
>
> > The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.
>
> *Board of Regents*, 468 U.S. at 117, 104 S.Ct. at 2968 (emphasis added). Although the U.S. Supreme Court did not state that eligibility rules were not subject to antitrust scrutiny, it cited a case with approval, *Jones v. NCAA*, 392 F.Supp. 295 (D.Mass.1975), which stated exactly that. *See Board of Regents*, 468 U.S. at 102 n. 24, 104 S.Ct. at 2961 n. 24.[6]

*Gaines*, 746 F.Supp. at 743. The court found that the overriding purpose of the eligibility rules was not to provide the NCAA with commercial advantage, but

---

5. *NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 120, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

6. In *Board of Regents*, the Supreme Court also cited with approval, *College Athletic Placement Serv.*, 1974 WL 998, which held that the antitrust laws do not apply to NCAA eligibility rules. This case was affirmed by the Third Circuit and is consistent with the Third Circuit's holding in *Smith*, 139 F.3d 180.

rather to prevent commercializing influences from destroying the unique "product" of NCAA college football and to preserve the unique atmosphere of competition between "student-athletes." *Id.* at 744. The court, therefore, concluded that the no-draft and no-agent rules could not be struck down, or even judged, by federal antitrust law. *Id.*

In this case, the NCAA argues that, for antitrust purposes, Bylaw 12.5.5 is indistinguishable from its noncommercial eligibility rules. According to the NCAA, Bylaw 12.5.5 should not be subject to Sherman Act scrutiny because the bylaw, like the eligibility rules, has neither the purpose nor the effect of giving the NCAA or its member institutions an advantage in any commercial transaction. The court agrees.

On its face, Bylaw 12.5.5 sets standards concerning advertising that may appear on uniforms, equipment, and other apparel worn by student athletes in NCAA competition. Specifically, the bylaw provides that (a) athletics equipment used in NCAA competition "shall bear only the manufacturer's normal label or trademark, as it is used on such items for sale to the general public;" and (b) a student-athlete's uniform and other items of apparel "shall bear only a single manufacturer's or distributor's normal label or trademark . . ., not to exceed 2 ¼ square inches in area. . . ."

To determine whether Bylaw 12.5.5 is commercial, the court must look to the underlying purposes of the bylaw, the NCAA's reasons for creating the advertising regulation, and whether the bylaw confers a direct economic benefit on the NCAA. In 1977, the rule that is now Bylaw 12.5.5 was codified as section 3.1(e) of the NCAA Constitution. To be consistent with the record, the court will refer to this rule as "constitution 3.1(e)." Constitution 3.1(e) provided that student-athletes were not to be involved in promoting commercial enterprises. In 1978, a member school questioned whether the wearing of a uniform with a logo on it was considered the promotion of commercial enterprises under the constitution. The NCAA determined that, if the uniform worn by the student-athlete was generally available to the public, constitution 3.1(e) would not be violated.

The rule governing the use of logos on apparel changed in 1983. At that time, the NCAA concluded that the rule then-in-effect governing the wearing of logos failed to adequately adhere to the constitutional provisions intended to protect student-athletes from commercial exploitation and to maintain the amateurism of college sports.[7] In response the Patrick Ewing incident, the NCAA Eligibility Committee reviewed the logo question to develop a new standard. In its 1984–85 Manual, the NCAA changed its existing logo rule and included a case study, known as Case No. 40, to explain the new rule's restrictions governing the size and number of logos that could be worn by collegiate athletes in competition. The new rule provided that the apparel and uniforms worn by student-athletes in competition could bear "only a single manufacturer's normal label or trademark not to exceed a 1 ½ inch [by 1 ½ inch] square in size." The NCAA eventually codified constitution 3.1(e) and Case No. 40 as Bylaw 12.5.4.

In April 1994, the NCAA adopted an official interpretation of Bylaw 12.5.4, which provided that student-athlete's uniforms and apparel could not bear a "design element similar to the manufacturer's logo (e.g. Adidas soccer shirt bearing three descending stripes on the shirt's shoulder, Umbro soccer shirt with the Umbro diamond repeated around the rib knit collar) that is in addition to another logo or that is contrary to the size restriction of Bylaw

---

7. Section 2.9 of the NCAA's constitution provides:

Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental, and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises.

12.5.4–(b)." Bylaw 12.5.4, as redefined by the 1994 interpretation, later became Bylaw 12.5.5.

With the origin and evolution of Bylaw 12.5.5 in mind, the court concludes that the purpose of Bylaw 12.5.5 and its predecessors is threefold. First, Bylaw 12.5.5 is designed to accomplish the NCAA's principle of maintaining amateurism by protecting student-athletes from commercial exploitation. Second, Bylaw 12.5.5 attempts to preserve the integrity and uniqueness of intercollegiate sports by preventing member schools from turning their student-athletes into billboards in the pursuit of advertising revenues. Third, the bylaw is designed to avoid excessive advertising that could potentially interfere with the basic function of the student-athletes' uniforms, which is to provide immediate identification of the athlete's number and team to his or her teammates and to the referee or umpire officiating the contest. There is no evidence before the court to suggest that the purpose of Bylaw 12.5.5 is to provide the NCAA or its member institutions with any commercial or economic advantage. The court concludes that Bylaw 12.5.5 has noncommercial purposes and objectives.[8]

It is not difficult to conceive of a facially noncommercial activity that confers an intentional and direct economic or competitive benefit to an antitrust defendant. Therefore, the court must next determine if the contested activity, despite its noncommercial nature and purposes, is objectively noncompetitive. To do so, the court must determine whether the NCAA or its member institutions receive a direct economic or competitive benefit from the enforcement of Bylaw 12.5.5. *See* IA Areeda and Hovenkamp, *supra* ¶ 262a, at 269 (endorsing use of an objective test to prevent manipulation or circumvention of the intent-based tests regularly applied by federal courts).

In this case and under the foregoing test, Adidas must show that the NCAA or its member institutions are likely to receive a direct economic benefit as a result of the enforcement of Bylaw 12.5.5's advertising restrictions. Adidas alleges that the NCAA is effectively competing with it and other sports apparel manufacturers by offering to place its "NCAA Football" logo on college uniforms.[9] Because the NCAA Football logo is not subject to Bylaw 12.5.5's restrictions, Adidas claims that the NCAA is reaping competitive benefits from its application of the bylaw to Adidas and other sports apparel manufacturers. Adidas, however, fails to provide evidence that the NCAA is currently a competitor in the sports apparel market or that the enforcement of Bylaw 12.5.5 will give the NCAA a competitive or economic advantage in its promotion of its NCAA Football logo. Any alleged advantage from the NCAA's concurrent use of the "NCAA Football" logo and enforcement of Bylaw 12.5.5 is purely speculative at this time. In sum, the court concludes that the NCAA and its member institutions are not competitors of Adidas and do not realize any financial or competitive advantage by limiting the amount of advertising allowed on the backs of student-athletes. Furthermore, if Bylaw 12.5.5 places any restraint on the advertising market, it is an incidental by-product of the NCAA's legitimate attempt to maintain the amateurism and integrity of college sports, and it does not economically benefit the NCAA or its member institutions.

---

**8.** Adidas' briefing focuses almost solely on the issue of whether 12.5.5 is necessary and whether its application is reasonable. Adidas fails to recognize that Bylaw 12.5.5 does not violate antitrust laws merely because it is potentially unnecessary, over-restrictive, or unfairly applied to Adidas.

**9.** NCAA Football is a tax exempt 501(c)(3) corporation made up of the NCAA, the American Football Coaches Association, NACDA (the athletic directors' association) and the Conference Commissioners' Association. NCAA Football is an effort to create awareness for and promote the game of college football. NCAA Football asks, but does not require, conferences to have their members place the NCAA Football mark on helmets and jerseys.

The Supreme Court stated that "each case arising under the Sherman Act must be determined on the particular facts disclosed by the record...." *Maple Flooring Mfrs' Assoc. v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). This is particularly true in the instant case where the court is ruling on the narrow issue of whether preliminary injunctive relief is necessary and appropriate. The court concludes from the evidence presented at the preliminary injunction hearing that Bylaw 12.5.5 is noncommercial in nature and purpose, and that the NCAA's enforcement of the bylaw is a noncommercial activity not subject to the antitrust laws. Adidas, therefore, has failed to show a likelihood of success on the merits of its antitrust claims.

*B. State Law Claims*

Adidas claims that the NCAA interfered with Adidas' contractual relations and prospective economic advantages, breached a contract between the parties, and violated public policy and its own bylaws and rules, all in violation of state law. The NCAA is a voluntary unincorporated association. *See Jones v. Wichita State Univ.,* 698 F.2d 1082, 1083 (10th Cir.1983). "As such, it is regarded under Kansas law as an aggregate of its members, and lacks the capacity to sue or to be sued in its own name." *University of Texas v. Vratil,* 96 F.3d 1337, 1339 (10th Cir.1996) (citing *Frey, Inc. v. City of Wichita,* 11 Kan. App.2d 116, 121, 715 P.2d 417 (1986)). Although Fed.R.Civ.P. 17(b)(1) allows unincorporated associations such as the NCAA to be sued in their own names for purposes of enforcing a federal right, the NCAA has no capacity to be sued for violations of state law. *Id.* Accordingly, the court concludes that Adidas has no likelihood of succeeding on the merits of its state law claims against the NCAA.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiff Adidas America Inc.'s motion for preliminary injunction (Doc. 3) is denied.

**IT IS SO ORDERED.**