**POCONO INVITATIONAL SPORTS CAMP, INC., and Eastern Invitational Basketball Clinic, Inc., and Future Stars Basketball, LLC., and Five–Star Basketball Camp, Inc. and Blue Star Productions, Inc., Plaintiffs**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant**

No. 00–CV–5708.

United States District Court, E.D. Pennsylvania.

April 30, 2004.

& Reath LLP, Philadelphia, PA, Frederick R. Juckniess, Gregory L. Curtner, Miller Canfield Paddock & Stone PLC, Ann Arbor, MI, Robert J. Wierenga, Sullivan & Cromwell, LLP, New York, NY, for Defendant.

Richard M. Meltzer, Pelino & Lentz PC, Philadelphia, PA, for Movants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

On November 9, 2000, plaintiffs Pocono Invitational Sports Camp, Inc. ("Pocono"), Eastern Invitational Basketball Clinic, Inc. ("Eastern"), Future Stars Basketball, LLC ("Future Stars"), Five–Star Basketball Camp, Inc. ("Five–Star"), and Blue Star Productions, Inc. ("Blue Star") brought this action against defendant National Collegiate Athletic Association ("NCAA"). Plaintiffs alleged two antitrust violations under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and one count of tortious interference with contractual arrangements and prospective contractual arrangements.[1] Jurisdiction is based on the existence of a federal question. Defendant has moved for summary judgment on all counts. For the reasons set forth below, I grant defendant's motion.

## I. FACTS [2]

### A. The Parties

Edward N. Cahn, Allentown, Pa, pro se.

Darin J. McMullen, Louis J. Sinatra, Pelino & Lentz PC, Ira P. Tiger, Schnader Harrison Segal & Lewis, Philadelphia, PA, for Plaintiffs.

David P. Bruton, Michael W. McTigue, Jr., Paul H. Saint–Antoine, Drinker Biddle

Plaintiffs are operators of for-profit summer basketball camps for children and

1. This case was originally assigned to Judge Edmund V. Ludwig, and was reassigned to me on June 9, 2003.

2. Defendant submitted a joint statement of material undisputed facts with its motion for summary judgment on September 11, 2003. In plaintiffs' response to the motion, they admitted some of the facts as undisputed, but listed many of defendant's proposed undisputed facts as actually disputed. Many of defendant's proposed facts, however, are supported

by uncontradicted evidence offered by defendant, such as the text of their constitution, written reports, and depositions. In response to a court order directing plaintiffs to supplement their previous filing, plaintiffs submitted their own statement of facts. Because defendant's proffered evidence is necessary to best present the relevant facts of this case, I will sometimes refer to facts as stated by defendant. In this opinion, when a fact is taken from the parties' joint submission of undisputed material facts and has not been contested

teenagers. (JSMF ¶ 26.) Plaintiffs also conduct a variety of other youth basketball events and activities, including shootouts, tournaments, travel teams, and leagues.[3] (*Id.*) Defendant has acknowledged that the plaintiffs in this case operate some of the finest summer basketball camps in the United States. (Pl. SMF ¶ 4.)

Defendant NCAA, formed in 1905, is a non-profit, voluntary unincorporated association of approximately 1260 colleges, universities, athletic conferences and affiliated organizations. (JSMF ¶ 1, *see also NCAA v. Bd. of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).) According to the NCAA Constitution, the purposes of the NCAA are, among other things, "[t]o uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of [the NCAA]," "[t]o formulate, copyright and publish rules of play governing intercollegiate athletics," and "[t]o legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics." (NCAA Constitution, Article 1.2.) One of the NCAA's many responsibilities is the regulation of coaches' recruiting of prospective student-athletes ("prospects"). (Def. SMF ¶ 12.) The NCAA Constitution includes a statement of the "basic purpose" of amateurism, which guides the organization's regulation of recruiting:

> The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

(NCAA Constitution, Article 1.3.1.)

The NCAA Constitution also provides a Principle of Recruiting:

> The recruiting process involves a balancing of the interests of prospective student-athletes, their educational institutions and the Association's member institutions. Recruiting regulations shall be designed to promote equity among member institutions in their recruiting of prospects and to shield them from undue pressures that may interfere with the scholastic or athletics interests of the prospects or their educational institutions.

(NCAA Constitution, Article 2.11.)

Although the NCAA does not own, sponsor, or operate any youth basketball camps, some of the NCAA member institutions do own and operate camps ("institutional camps"). These institutional camps compete with plaintiffs' camps ("non-institutional camps") for campers. (Pl. SMF ¶ 9.) One notable difference between institutional and non-institutional camps is that institutional camps are subject to NCAA

---

by plaintiffs, it will be cited as "Joint Statement of Material Facts," or "JSMF". When a fact is taken from this document but plaintiffs have disputed it, it will be cited as "Def. SMF". When a fact is taken from plaintiffs' statement of facts, it will be cited as "Pl. SMF".

**3.** Plaintiff Pocono operates summer basketball camps for boys and girls and has been running basketball camps for 38 years. (JSMF ¶ 42.) Plaintiff Eastern operates boys and girls basketball camps during the summer. (JSMF ¶ 43.) Plaintiff Future Stars has been operating 5-day summer basketball camps for boys since 1997, and a girls basketball camp since 1994. (JSMF ¶ 27.) Plaintiff Five-Star runs both boys and girls basketball camps and has run basketball events and camps for 35 years. (JSMF ¶¶ 35–36.) Plaintiff Blue Star operates several girls basketball events, including camps, showcases and shoot-outs. (JSMF ¶ 30.)

rules, including the entirety of the NCAA's amateurism and recruiting bylaws. (Def. SMF ¶ 55, NCAA Bylaw 13.13.) Among other things, these guidelines require that institutional camps be open to any and all entrants. Plaintiffs' non-institutional camps, on the other hand, are free to be selective. Non-institutional camps are not subject to the NCAA's direct control, although they are indirectly affected by many NCAA recruiting rules.

## B. NCAA Regulating Activity and the Challenged Regulations

Under its constitution, the NCAA membership adopts and amends its various bylaws and regulations to advance the organization's principles. (NCAA Constitution, Article 2.01.) Plaintiffs challenge certain regulations affecting the recruiting of Division I basketball players at their summer basketball camps.[4] Specifically, plaintiffs challenge three of these NCAA recruiting regulations as anticompetitive: (1) the NCAA requirement that Division I coaches can only evaluate prospects at non-institutional basketball camps if the camps are certified by the NCAA (Bylaw 13.13.3) and the requirements with which non-institutional camps must comply in order to be certified (Administrative Regulation § 30.16); (2) the reduced number of days coaches are permitted to visit plaintiffs' camps; and (3) the prohibition of Division I men's basketball coaches from accepting employment with non-institutional camps attended by prospects (former Bylaw 13.13.2.3.2, in effect from 1990 to 2001).

I will describe each of the challenged recruiting regulations in turn.

### The Certification Requirement and Process

Plaintiffs object to both the existence of the certification requirement, and the certification process. Since 1993, Division I basketball coaches are only permitted by the NCAA to attend (1) institutional camps and (2) non-institutional camps certified by the NCAA. (JSMF ¶ 71.) In order for a summer basketball event in men's basketball to be certified, an application form must be submitted to the NCAA forty-five days before the camp begins. The following criteria must be met:[5]

- A comprehensive financial disclosure of information related to the operation of the event (and any team participating in the event) [must be submitted];

- Admissions fees charged to all event participants must be similar;

- No air or ground transportation or other gifts or inducements shall be provided to the event participants or their coaches or relatives;

- A prospective student-athlete who attends an NCAA certified event shall not retain any athletics equipment or apparel provided for his use at the event other than an event T-shirt. All other apparel (e.g. shoes or shorts) may be retained only if the prospect is charged the normal retail value of such items (as opposed to

4. Division I is comprised of approximately 325 member *institutions and is generally* composed of those member institutions and conferences who participate in the highest level of intercollegiate athletic competition. (JSMF ¶ 8.) There are two other membership divisions, and each of the three has its own federated governance structure. (JSMF ¶ 16.) Division II is comprised of approximately 270 institutions, and is more regionally-based in both competition and recruitment. (JSMF ¶ 9.) Division III is comprised of approximately 411 member institutions, and these institutions do not provide student-athletes with athletic scholarships. (JSMF ¶ 16.)

5. Because plaintiffs complain that the certification requirements are unduly burdensome, the requirements are set forth in their entirety.

the event's cost in purchasing the items);

- Compensation provided to event personnel shall be commensurate with the going rate for event personnel of like teaching ability and event experience;

- The event or tour shall include a comprehensive educational session presented in-person or in a video format that includes a review of regulations related to initial-eligibility standards, gambling, agents and drug use (*Revised January 13, 2003);*

- An event operator, staff member of a league or member of any team may not participate if the individual has been found guilty or pleaded guilty in a court of law for having been involved in sports bribery, point shaving or game fixing;

- The event shall not be conducted in a venue where sports wagering on intercollegiate athletics is permitted, or on property sponsored by an establishment that permits sports wagering on intercollegiate athletics or branded with signage for such an establishment;

- The event (and any team participating in the event) shall not be operated or managed by any individual or agency involved in the marketing of any individual's athletics reputation or ability;

- The event (and any team participating in the event) may not receive financial support from any individual or agency involved in marketing any individual's athletics reputation or ability or any representatives of an NCAA member institution's athletics interests that is assisting or has assisted in the recruiting process;

- Individuals involved in coaching activities must have been approved in accordance with guidelines established by the NCAA basketball certification staff (*Revised January 13, 2003*);

- Participants on nonscholastic teams must be legal residents of the state in which the team is located or a geographically adjoining state and not more than a total of three prospects from adjoining states may participate on any one nonscholastic team (*Revised January 13, 2003*); and

- A participant may receive an award, provided the cost of the award is included in the participant's entry fee (*Adopted January 13, 2003*).

(NCAA Bylaw 30.17, adopted 11/1/01, effective April 1, 2002 (except those requirements noted as having been adopted or revised on January 13, 2003).)

The institutional camps are not subject to the certification requirements, but are required to abide by all NCAA amateurism and recruiting bylaws. These bylaws require that institutional camps, among other things:

- must be open to any and all entrants (Bylaw 13.13.1.2),

- are not permitted to pay a prospect's expenses to attend camp (Bylaw 13.13.1.5.2),

- may only give prospects awards with the understanding that the cost of such awards is included in the admissions fees (Bylaw 13.13.1.5.4),

- must include an educational session detailing NCAA initial-eligibility standards to all camp participants (Bylaw 13.13.1.6.)

There is no evidence on the record about what fees, if any, are required of non-institutional camps that wish to be certified. Plaintiffs are currently all certified. Plaintiffs have offered no evidence about

what harm compliance with this requirement and process has caused them.

### The Reduction in the Length of Coach Visits to Plaintiffs' Camps

In 1981, the NCAA developed a complex recruiting calendar for Division I men's basketball. (JSMF ¶ 76.) The recruiting calendar is divided by type of permitted coach activity, and there are four types of recruiting periods: Contact periods, Evaluation periods, Quiet periods and Dead periods. The NCAA bylaws describe the periods as follows:

> **Contact Period:** that period of time when it is permissible for authorized athletics department staff members to make in-person, off-campus recruiting contacts and evaluations. (NCAA Bylaw 13.02.4.1)
>
> **Evaluation Period:** that period of time when it is permissible for authorized athletics department staff members to be involved in off-campus activities designed to assess the academic qualifications and playing ability of prospects. No in-person off-campus recruiting contacts shall be made with the prospect during an evaluation period. (NCAA Bylaw 13.02.4.2)
>
> **Quiet Period:** that period of time when it is permissible to make in-person recruiting contacts only on the member institution's campus. No in-person, off-campus recruiting contacts or evaluations may be made during the quiet period. (NCAA Bylaw 13.02.4.3)
>
> **Dead Period:** that period of time when it is not permissible to make in-person recruiting contacts or evaluations on or off the member institution's campus or to permit official or unofficial visits by

prospects to the institution's campus. The provision of complimentary admissions to a prospect during a dead period is prohibited, except as provided in Bylaw 13.8.2.5 for a prospect who visits an institution as part of a group. During such a dead period, a coaching staff member may not serve as a speaker at or attend a meeting or banquet at which prospects are in attendance, except as provided in Bylaw 13.1.9.1, and may not visit the prospects' educational institutions. It remains permissible, however, for an institutional staff member to write or telephone prospects during such a dead period. (NCAA Bylaw 13.02.4.4)

Plaintiffs object to the reduced length of the evaluation period, which has fluctuated many times over the years. In 1981, the summer evaluation period was 45 days. (JSMF ¶ 76.) Although the period was shortened to one month in 1983, from 1984 to 1986 it was increased back to 45 days. (JSMF ¶ 77.) In 1987, the summer evaluation period was decreased again to 21 days. (JSMF ¶ 78.) From 1989 to 1994, the period was 27 days. (JSMF ¶ 79.) In 1994, the evaluation period was reduced to 24 days. (JSMF ¶ 80.) In 2000, when this suit was filed, the NCAA reduced the evaluation period from 24 days to 14 days for the summer of 2001. (Def. SMF ¶ 85.) In 2002, the evaluation period was 20 days. (Def. SMF ¶ 92.)

Plaintiffs claim that giving their campers the opportunity to display their skills before Division I college basketball coaches, which can only occur during the evaluation period, is essential to the success of their camps.[6] (Pl. SMF ¶ 10.) Accordingly, plaintiffs factor the NCAA recruiting calendar into their camp schedules.[7] Howev-

---

**6.** Although plaintiffs describe Division I coach evaluation as "essential" in their complaint (which is supported by the verification of Pocono and Eastern representative Robert Kennedy,) plaintiffs Five Star, Blue Star and Pocono have admitted that attendance by Di-

vision I basketball coaches is "not necessary" to the operation of a basketball camp. (JSMF ¶¶ 104, 106, 109.)

**7.** For example, plaintiff Blue Star, in addition to its other basketball activities, runs an elite,

er, plaintiffs concede that they cannot and do not guarantee to campers that any Division I coaches will attend the camps to observe the campers. (JSMF ¶ 94.)

Although plaintiffs claim that the NCAA permits observations and evaluations to take place at institutional basketball camps throughout the months of June, July and August, defendant claims that institutional camps are never permitted to have formal observation and evaluation of players by Division I coaches. Plaintiffs have offered the following evidence in support of their claim that the institutional camps permit observation and evaluation throughout the summer: (1) the text of NCAA Bylaw 13.13.1.1.2: "An institution's football or basketball camp or clinic may be conducted only during the months of June, July and August, unless such activities meet the provisions regarding developmental clinics set forth in Bylaw 13.12.3.1"; and (2) the deposition of Wilbur H. Klein, a representative of plaintiff Five–Star, which suggests that observation and evaluation occur by Division I

coaches who are employed by the institutional camps. Plaintiffs offer no evidence suggesting that a Division I coach who is not employed by an institutional camp can observe and evaluate prospects at that camp outside of the official evaluation period, nor any evidence that Division I coaches employed by institutional camps are permitted to formally evaluate players while coaching them.[8]

### The Coach Employment Prohibition

According to plaintiffs, it is significant to the success of a summer basketball camp that the participants be exposed to, and taught by, the most knowledgeable, capable and experienced coaches available. (Pl. SMF ¶ 11.) From 1990 through 2001, the NCAA prohibited Division I college basketball coaches from being employed by or lecturing at non-institutional basketball camps, though these coaches were permitted to coach and lecture at institutional basketball camps. (NCAA Bylaw 13.13.2.3.2.) This restriction was lifted for the 2002 summer camp season.

invitation-only camp during the July evaluation period (JSMF ¶ 30) and plaintiff Future Stars generally operates one week of camp during the evaluation period and one week outside of the evaluation period. (JSMF ¶ 27.)

8. Wilbur Klein was pressed on this point at his deposition, but ultimately conceded that coaches not employed by institutional camps were not permitted to observe and evaluate at those camps outside of the evaluation period:

Q: Is it your belief that the institutional camps have advantages over the private camps?
A: Yes.
Q: And I think one of them that you talked about is the fact that they can hire Division I coaches either from their own institution or others?
A: Plus, they can see kids play in the quiet period and they can't see those kids play at

our camp. It's a big advantage. It means a kid who wants to be seen—let's say a kid can only go to camp in June. He's going with his parents on a summer trip to Europe, but he wants to be seen. So he's going to go to North Carolina's camp and not to Five–Star.
Q: But he's only going to be seen by the North Carolina coach?
A: Or whoever happens to go there. They don't tell people you can't come in.
Q: But other coaches can't go outside of the live period; isn't that true?
A: I don't know that. If there's an institutional camp, a coach can work at that camp, can't he? In other words, Wojo from Duke can work at North Carolina's camp.
Q: I guess he can work there. But unless he's employed there, he can't go there; right?
A: But once a coach is there, he's there. He sees a kid play. That's an advantage no matter how you cut it.
(Klein Dep. 121–23.)

## C. *The Parties' Explanations for the Bylaws at Issue*

Not surprisingly, the parties offer very different explanations for the challenged recruiting regulations.

Plaintiffs claim that the NCAA enacted the rules and regulations at issue in this case "in order to protect institutional basketball camps and to harm non-institutional basketball camps." (Pl. SMF ¶ 26.) Plaintiffs also claim that the "NCAA [has] threatened to destroy non-institutional basketball camps." (Pl. SMF ¶ 27.)

Defendant responds that its regulation of the recruiting of student-athletes is intended to protect the young prospects from being exploited, and that this regulation has been in place for decades.[9] Defendant further states that the contested recruiting regulations were instituted in response to a growing concern that the summer evaluation period had become "cancerous" and that the campers were subjected to too much pressure. (Def. SMF ¶ 74.) Defendant has responded in detail about each of the three challenged recruiting regulations, and I will summarize each explanation briefly.

As for the certification requirement, in 1991, in response to a report[10] prepared about the problems in summer recruiting, defendant considered sponsoring or running its own summer camps. The NCAA ultimately rejected this idea, and decided instead to develop a certification program for non-institutional camps. (JSMF ¶ 71.) Division I coaches would only be permitted to attend and evaluate prospects and non-institutional camps that complied with the certification requirements. (*Id.*) In this way, defendant was not exercising direct control over the non-institutional camps, but rather over the coaches, who are employees of NCAA member institution schools.

Turning to the reduction in the evaluation period, in August 1998, the NCAA Division I Board of Directors created the Division I Working Group to Study Basketball Issues to examine issues impacting basketball, including recruiting and the summer evaluation season. (JSMF ¶ 81.) Among the problems discovered by the Working Group were street agents taking advantage of prospects, the summer season hurting prospects by making them miss classes and tests, and a lack of parental involvement which exposed the prospects to exploitation by "street agents, runners, and hangers-on." (Def. SMF ¶ 82.) After a year of meetings and information gathering, the Working Group identified goals for the recruiting rules, which included increasing the importance of scholastics and decreasing the impact of nonscholastic external influences in basket-

---

9. Defendant identifies Myron Piggie, a summer coach indicted for his schemes to take advantage of high school athletes, as illustrative of the problems involved in summer recruiting. Piggie's criminal activities, which resulted in a 37 month prison term and restitution in the amount of $324,279.87, are described in detail in the Eighth Circuit's affirmance of his sentence. *United States v. Myron Piggie*, 303 F.3d 923 (8th Cir.2002).

10. In this report, the NCAA Recruiting Committee found that: "Currently, the area of basketball recruiting has become more of a showplace for prospective student-athletes and 'advisors' to parade their basketball tal-

ent in a manner that seems inconsistent and inappropriate for college athletic recruiters. A number of college coaches have indicated that the recruitment of basketball prospective student-athletes during the summer months requires coaches to expend funds unnecessarily for the sole purpose of being seen at any of dozens of outside privately owned summer basketball camps. Also, many of these camps are selective with regard to which coaches have preferential treatment in observing a particular prospective student-athlete's abilities." *Report of the NCAA Recruiting Committee to the NCAA Council*, July 23, 1991. (Def. Ex. 7.)

ball student-athlete recruitment. (Def. SMF ¶ 82.) The Working Group was eventually replaced by a standing subcommittee, the Basketball Issues Subcommittee. (JSMF ¶ 81.)

The reduction in evaluation period days from 24 to 14 for the 2000 summer camp season resulted from the NCAA Board of Directors' approval of one of several proposals aimed at promoting amateurism. The NCAA detailed as its rational for the proposal, among other things, to "decrease the impact of nonscholastic external influences in the recruitment of prospective basketball student-athletes." (Def. SMF ¶ 87.) In response to concerns that too much of the evaluation period occurred in the summer when prospects are away from their parents and high school coaches, at the same time that the summer evaluation period was reduced by 10 days, the number of evaluation days permitted during the academic year was increased from 40 days to 50. Graham Spanier, President of Pennsylvania State University, who served on the NCAA Board of Directors and the Executive Committee that approved the change in evaluation days, was deposed on the question of what problems the NCAA was responding to in making these changes:

> The problems ranged from the length of the summer period and how taxing this was for high school students from a physical and emotional standpoint, time away from home, coaches who are away from home and away from campuses for considerable lengths of time, costs associated with all of the travel, rather widespread reports of corruption in the summer programs, the growing involvement of agents and runners, street agents, the improper level of contacts between players and coaches and others, concerns about high school coaches whose influence was being diminished because of the involvement of others, shoe company involvement. Those were most, but

probably not all of the different kinds of concerns that had emerged among athletic directors, to some extent basketball coaches, certainly university presidents and the public more generally.

(Spanier Dep. 27–28.)

After the evaluation period was reduced to 14 days for the 2000 season, the NCAA Division I Basketball Issues Committee continued to examine its recruiting rules. After taking into account what the prospects could handle, the minimum number of days needed and the maximum number that could be monitored, the Committee suggested increasing the period from 14 to 20 days, and this recommendation was adopted. (Def. SMF ¶ 92.)

Defendant provides a two-fold response to plaintiffs' complaint about the decade long restriction on Division I coaches working at non-institutional camps. First, defendant offers what it believes to be a legitimate, non-discriminatory motivation for the rule. Specifically, defendant explains that the NCAA was concerned that if these coaches were permitted to work at non-institutional camps, they could obtain a recruiting advantage as compared with those coaches who could only evaluate prospects during the evaluation periods. (Def.Mot.Summ. J. 20.) Second, defendant contends that some of the plaintiffs themselves supported the rule. In this regard, defendant has brought forth evidence that representatives of plaintiffs Pocono, Eastern, Five Star and Future Stars all signed a letter sent to the NCAA (submitted by the American Basketball Camp Association, of which these four camps are members) in 1991 which unequivocally expressed their support for prohibiting Division I coaches from working at non-institutional camps. (Def. SMF ¶ 67, accompanied by Def. Ex. 8, Letter to NCAA Director of Legislation from

American Basketball Camp Association, 12/16/91 at BS 986 & 989). In addition, in the letter these four plaintiffs also all stated that a rule against employing Division I coaches was already in effect at their camps. (*Id.*)

The prohibition on Division I coaches working at non-institutional summer camps was repealed in 2001 as part of an "on-going process of deregulation and simplification of [NCAA bylaws]." (Def. SMF ¶ 68.) Since then, Division I coaches have been permitted to work at non-institutional camps that meet the NCAA certification requirements.

### The Market

Plaintiffs describe the relevant product market as the operation of summer basketball camps. (Pl. SMF ¶ 5.) Although plaintiffs state the relevant product market in these terms in several papers (including their verified complaint, statement of facts, and an interrogatory answer,) they offer no evidentiary support for the statement. Plaintiffs describe the geographic scope of the market as the United States of America. (Pl. SMF ¶ 6.) In support of this assertion, plaintiffs offer the deposition testimony of three representatives from plaintiffs' camps. These depositions offer no specific numbers or data, but do indicate that the players and coaches at plaintiffs' camps come from all over the United States. (*See* Pl. SMF ¶ 6, citing Robert W. Kennedy Dep. 81, 98; Wilbur H. Klein Dep. 50; Van D. Coleman Dep. 36.)

### Damages

Plaintiffs claim that their damages will require calculations of the different profits of institutional and non-institutional camps. (Def. Ex. 41, Plaintiffs' Response to Defendant's First Set of Interrogatories). Plaintiffs estimate that the loss of profit for each of the named plaintiffs each summer ranges from approximately $10,000 to $30,000. (Pl's Resp. Def's 1st Interrogs ¶ 12.)

### LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). Stated differently, "[t]he inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, when the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### I. DISCUSSION

Defendant first argues that plaintiffs do not have standing to bring their antitrust claims. Because plaintiffs have presented sufficient facts to arguably overcome a standing challenge, I will proceed to defendant's stronger contentions. Defendant makes the following arguments in support

of its motion for summary judgment: (1) the claim under § 1 of the Sherman Act fails because: (a) the recruiting rules are noncommercial and therefore are not subject to Sherman Act scrutiny, (b) plaintiffs have not plead a relevant market and (c) the restrictions are reasonable; (2) plaintiffs cannot prove their essential facilities claim under § 2 of the Sherman Act; and (3) plaintiffs cannot show tortious interference with any contract.

## III. SHERMAN ACT § 1

### A. Roadmap of the Analysis

Section 1 of the Sherman Act provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1988).[11] Analysis of an antitrust claim under § 1 of the Sherman Act is a multistep process.

■ The plaintiff must first show that the challenged restraint involves "trade or commerce," or, in other words, is the restraint "commercial." If the restraint is not commercial, it cannot be analyzed under the antitrust laws. Because it is a strong argument of defendant, this contention will be addressed.

■ If the challenged restraint is commercial, the plaintiff must next show that the restraint is illegal. Despite the plain language of § 1 of the Sherman Act, not all commercial restraints are illegal. If they were, every contract would be prohibited. Instead, commercial restraints are illegal if the restraint is unreasonable. The court makes the determination of unreasonableness under either a *"per se"* or "rule of reason" analysis. In a *per se* analysis, conduct that is "manifestly anti-

competitive" is "conclusively presumed to unreasonably restrain competition without elaborate inquiry as to the precise harm it has caused or the business excuse for its use." *Rossi v. Standard Roofing,* 156 F.3d 452, 461 (3d Cir.1998) (citations omitted). A "manifestly anticompetitive restraint" might include an outright agreement to restrain trade. If a restraint is not *per se* unreasonable, however, a court should apply rule of reason analysis.

■ Analysis under the rule of reason involves three steps: (1) plaintiff must demonstrate that a competitive restraint has had substantial adverse, anti-competitive effects; (2) defendant must then show that the challenged conduct promotes a sufficiently pro-competitive objective; and (3) in rebuttal, plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective. *United States v. Brown Univ.,* 5 F.3d 658, 668 (3d Cir.1993).

■ The first step of rule of reason analysis, plaintiff's burden of proving the substantial adverse, anti-competitive effects, itself requires plaintiff to prove four things: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Rossi,* 156 F.3d at 464–65. My discussion of the rule of reason will focus on prong two of this test, which requires a plaintiff to adequately identify a relevant product and geographic market.

---

11. A private right of action for violations of the Sherman Act is created by 15 U.S.C. § 15 (2004).

With this analytical framework in mind, I will evaluate plaintiffs' claim under § 1 of the Sherman Act.

### B. *"Trade or Commerce"*

■ Plaintiffs allege that the challenged NCAA bylaws violate § 1 of the Sherman Act. The Act, however, is limited in its application in that, "Section one [of the Sherman Act], by its terms, does not apply to all conspiracies, but only to those which restrain 'trade or commerce'." *Brown Univ.*, 5 F.3d at 665. The threshold question is therefore whether the alleged conspiracy is one which restrains trade or commerce. Defendant argues that the three challenged regulations are recruiting rules and recruiting is not a commercial activity. The rules are: (1) the NCAA requirement that Division I coaches can only evaluate prospects at non-institutional basketball camps if the camps are certified by the NCAA and meet the requirements with which non-institutional camps must comply in order to be certified; (2) a rule reducing the number of days coaches are permitted to visit plaintiffs' camps; and (3) the prohibition of Division I men's basketball coaches from accepting employment with non-institutional camps attended by prospects. Plaintiffs respond that the NCAA regulations are commercial because they impose costs on non-institutional basketball camps and affect who can coach at and visit the camps.

"Courts classify a transaction as commercial or noncommercial based on the nature of the conduct in light of the totality of surrounding circumstances." *Id.* at 666. There is no question that § 1 of the Sherman Act applies to the activities of nonprofit organizations, including defendant. *Id.* at 665 ("Nonprofit organizations are not beyond the purview of the Sherman Act, because the absence of profit is no guarantee that an entity will act in the best interest of consumers.")

The Third Circuit has held that eligibility rules promulgated by the NCAA are not within the meaning of "trade or commerce" under § 1 of the Sherman Act. *Smith v. NCAA*, 139 F.3d 180, 185 (3d Cir.1998), *vacated on other grounds, NCAA v. Smith*, 525 U.S. 459, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999).[12] In *Smith*, plaintiff, a student athlete, challenged an NCAA bylaw which prohibited any student athlete from participating in intercollegiate athletics while enrolled in a graduate program at an institution other than the student athlete's undergraduate institution. In addition to a Sherman Act claim, the plaintiff in *Smith* also brought a private action for a Title IX violation. The district court dismissed the antitrust claim, holding that NCAA eligibility bylaws have no nexus to commercial or business activities. The district court also dismissed the Title IX claim. On appeal, the Third Circuit affirmed the dismissal of the Sherman Act claim, likewise holding that the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements because the activity is not a commercial or business

12. The 1984 Supreme Court decision, *NCAA v. Bd. of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), and the other two circuit court decisions that have addressed individual NCAA rules under the antitrust laws, *Law v. NCAA*, 134 F.3d 1010 (10th Cir.1998) and *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir.1988), have done so by employing a rule of reason analysis. Among appellate courts, the Third Circuit is alone in deciding whether the NCAA activity involves trade or commerce as a threshold issue (*see McCormack*, 845 F.2d at 1343, in which the Fifth Circuit "assum[ed] without deciding" that antitrust laws apply to eligibility rules before discussing the challenged eligibility rules before them under the rule of reason.) Although the *Smith* decision itself was vacated and remanded, its ruling that an eligibility rule promulgated by the NCAA is not "trade or commerce" remains a part of the Third Circuit jurisprudence and will be relied upon in this case.

one. *Smith v. NCAA*, 139 F.3d 180, 185–86 (3d Cir.1998). Considering the character of the NCAA's activities relating to eligibility, the court explained that: "Rather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics." *Id.* at 185.[13]

In *Smith*, the Third Circuit cited with approval three district court opinions that found that antitrust laws do not apply to NCAA eligibility rules: *Gaines v. NCAA*, 746 F.Supp. 738 (M.D.Tenn.1990); [14] *Jones v. NCAA*, 392 F.Supp. 295 (D.Mass.1975); *Coll. Athletic Placement Serv., Inc. v. NCAA*, No. Civ. A. 74–1144, 1974 WL 998, 1974 U.S. Dist. LEXIS 7050 (D.N.J. Aug.22, 1974), *aff'd without opinion*, 506 F.2d 1050 (3d Cir.1974). *Id.* at 185. The *Smith* court's approval of the case from the District of New Jersey is instructive for the present analysis. In that case, plaintiffs College Athletic Placement Service, Inc.. ("CAPS") and College Athletic

13. The Third Circuit then turned to the Title IX issue, and proceeded to vacate the district court's dismissal of the Title IX claim, reverse the district court's denial of plaintiff's motion for leave to amend her complaint with respect to the Title IX claim, and remand the Title IX issues to the district court. Both the Sherman Act issue and the Title IX issue were then appealed to the Supreme Court. The Supreme Court denied certiorari on the Sherman Act question and granted certiorari on the question of whether a private action under Title IX is applicable to NCAA activities. In the Supreme Court opinion, which solely addressed the Title IX issue, the Court vacated and remanded the Third Circuit opinion. *NCAA v. Smith*, 525 U.S. 459, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999). On remand, the Third Circuit considered two alternative theories for bringing the NCAA under the prescriptions of Title IX, and remanded to the district court for further proceedings. *Smith v. NCAA*, 266 F.3d 152 (3d Cir.2001). No further *Smith* opinions are reported.

Three months after the Third Circuit affirmed the dismissal of the antitrust claim (and before *Smith* went before the Supreme Court), another district court in this circuit relied on *Smith* to dismiss a challenge to NCAA eligibility rules brought under the Sherman Act. *Bowers v. NCAA*, 9 F.Supp.2d 460, 497 (D.N.J.1998). Since the Supreme Court's ruling on the Title IX question, one other district court has relied on the Third Circuit's holding in *Smith* regarding the Sherman Act. In *Adidas America, Inc. v. NCAA*, 40 F.Supp.2d 1275 (D.Kansas 1999), the court considered a challenge to an NCAA bylaw that limited the size of advertising logos permitted to appear on student-athletes' uniforms during NCAA competitions. The court relied on *Smith* to find that antitrust scrutiny could not apply because the bylaw had neither the purpose nor the effect of giving the NCAA or its member institutions an advantage in any commercial transaction. *Adidas*, 40 F.Supp.2d at 1283–84, 1287. The court noted that *Smith* had been vacated on other grounds, and that both before and after the *Smith* decision other courts had reached the same conclusion about eligibility rules. *Id.* at 1284 (citing *Bowers v. NCAA*, 9 F.Supp.2d 460 (D.N.J.1998); *Gaines v. NCAA*, 746 F.Supp. 738 (M.D.Tenn.1990); *Jones v. NCAA*, 392 F.Supp. 295 (D.Mass.1975).)

14. This district court decision discusses several of the NCAA eligibility cases in detail and offers its own rationale for not deeming the eligibility rules commercial: "According to the NCAA Constitution, the purposes of the NCAA eligibility Rules are to maintain amateur intercollegiate athletics 'as an integral part of the educational program and the athlete as an integral part of the student body and by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.' The overriding purpose of the eligibility Rules, thus, is not to provide the NCAA with commercial advantage, but rather the opposite extreme—to prevent commercializing influences from destroying the unique 'product' of NCAA college football. Even in the increasingly commercial modern world, this Court believes there is still validity to the Athenian concept of a complete education derived from fostering full growth of both mind and body. The overriding purpose behind the NCAA Rules at issue in this case is to preserve the unique atmosphere of competition between 'student-athletes.' " *Gaines*, 746 F.Supp. at 744. (citations omitted).

Placement Service of Ohio, Inc. ("CAPS of Ohio") were both companies who located athletic scholarships offered by colleges and universities to high school student athletes in exchange for contractual fees from the students' parents. Plaintiffs' services enabled student athletes to obtain scholarships of which they would normally be unaware and also assisted students in selecting the most suitable colleges for their scholastic and athletic abilities. CAPS was organized in reliance on a letter from the NCAA stating that no student athlete's eligibility would be jeopardized by contracting with CAPS. Only eighteen months after assuring CAPS that it would not consider students' association with the company a bar to eligibility, the NCAA passed an amendment which, in effect rendered any student athlete who utilized plaintiffs' services ineligible for NCAA competition. Plaintiffs brought suit under § 1 of the Sherman Act, claiming that the amendment was tantamount to a group boycott, a *per se* violation of the antitrust laws. *CAPS*, 1974 WL 998 at *2, 1974 U.S. Dist. LEXIS 7050 at *5.

The *CAPS* court did not specifically discuss whether the restraint was commercial, but instead framed its discussion of the issue as a question of whether the parties even competed with each other. In this regard, the court found that there was no competition, and that the "NCAA's action in ratifying an amendment to its Constitution for the purpose of preserving educational standards in its member institutions does not come within the purview of the Sherman Act." *CAPS*, 1974 WL 998 at *4, 1974 U.S. Dist. LEXIS 7050 at *10–11. Thus, the *CAPS* court found that the NCAA could not be liable for an antitrust violation when it was acting in its paternalistic capacity of promoting education. Like the rule considered by that court, the regulations challenged by plaintiffs in the present case were enacted by the NCAA for paternalistic reasons. The NCAA has

provided substantial evidence in support of its position that the rules were enacted to protect young players from being exploited. The NCAA assembled a committee to study and analyze the problems campers at non-institutional camps had been having for years. The committee carefully evaluated the best methods of preventing manipulation and exploitation of the campers. (*See* Def. Ex. 7.) Plaintiffs have offered no evidence that rebuts the evidence disclosed by studies demonstrating abuse under the prior system.

The evidence shows that the NCAA enacted the certification requirement in response to basketball recruiting becoming a "showplace" that seemed "inconsistent and inappropriate for college athletic recruiters." (*See id.*) In this regard, many of the certification requirements, such as the requirement that camp staff not have a history of illegal involvement in sports, the prohibition of gifts and inducements, and the requirement that camp events not be financed by marketers, are grounded in the paternalistic goal of separating high school athletics from the realm of professional sports.

The evidence also shows that the NCAA reduced the summer evaluation period so that prospects would have more recruiting time when parents and coaches were available to supervise the process. (Def. SMF ¶ 82.) The NCAA committee's goal, as recommended by its study, was to increase the importance of scholastics and decrease the impact of nonscholastic external influences on the prospects' lives. (*Id.*) The deposition testimony of Mr. Spanier, President of Pennsylvania State University, summarizes the concerns of many of those involved in the promulgation of the bylaws. Mr. Spanier noted how physically and emotionally taxing the length of the summer evaluation periods was for high school students, and how the community was concerned about the diminished involvement

of high school coaches. (Spanier Dep. 27–28.) This finding supports the NCAA's position that the rules were enacted in the spirit of promoting amateurism, and with the prospects' best interests in mind.[15]

The evidence further shows that these justifications are in keeping with the NCAA principles of amateurism and recruiting that aim to promote education and keep student athletics separate from professional sports. As the district court did in CAPS, a decision affirmed by the Third Circuit at the time and approved again twenty-four years later in Smith, I conclude that when the NCAA promulgated these rules it was acting in a paternalistic capacity to promote amateurism and education. Thus, for the same reasons the Third Circuit found eligibility rules immune from antitrust scrutiny, I find that these recruiting rules are also immune.[16] Plaintiffs' argument that the rules are commercial because they impose costs on the camps and affect who can coach at and visit the camps is therefore unpersuasive; the Third Circuit test for whether a restraint is commercial or noncommercial is not whether the restraint results in some kind of incidental economic effect. The restrictions challenged by plaintiffs are not commercial within the Third Circuit's interpretation of the Sherman Act, and are therefore not subject to Sherman Act scrutiny in this case.

## C. "Reasonable Restraint"[17]

Although the language in § 1 of the Sherman Act suggests a broad restriction on commercial restraints, the Supreme Court has repeatedly recognized that this provision covers only unreasonable restraints of trade. NCAA v. Bd. of Regents, 468 U.S. 85, 98, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

■■■ As stated previously, in determining whether a defendant's conduct unreasonably restrains trade, courts apply one of two modes of analysis. Rossi, 156 F.3d at 461. Courts apply per se analysis when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." Bd. of Regents, 468 U.S. at 100, 104 S.Ct. 2948 (quoting Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)). In a per se analysis, conduct that is "manifestly anticompetitive" is "conclusively presumed to unreasonably restrain competition without elaborate inquiry as to the precise harm it has caused or the business excuse for its use." Rossi, 156 F.3d at 461(citations omitted.)[18] If a court finds

---

15. Also, the NCAA presents evidence that the restriction on Division I coaches working at non-institutional camps happened with the explicit approval of some of the plaintiffs, and that allowing coach employment at the camps would have resulted in unfair recruiting advantages. (Def. SMF ¶ 67, Def.'s Mot. Summ. J. 20.)

16. The rules challenged in this case do not constitute trade or commerce under Third Circuit law. Certainly there are recruiting rules that, even in the Third Circuit, and certainly under the rule of reason, would be cognizable under the Sherman Act.

17. Although I find that the NCAA bylaws in question are not commercial and therefore

not subject to Sherman Act scrutiny, I will continue the analysis as an alternative basis for summary judgment because the inquiry is also relevant to the claim under § 2 of the Act.

18. A per se rule is a "major corollary of the rule of reason." The rule "applies to certain practices that have been found to be so 'plainly anticompetitive' that they are conclusively presumed illegal without an examination of market factors or business reasons justifying their existence. Per se illegality is limited to those practices that are naked restraints lacking any procompetitive virtues. Courts will not declare a restraint per se illegal unless they have had considerable experience examining the restraint and the industry in ques-

that a restraint is not *per se* unreasonable, the rule of reason analysis is applied. In applying this analysis, the court "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).)

Since the Supreme Court applied rule of reason analysis to *NCAA v. Bd. of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984),[19] the Third Circuit has also applied rule of reason analysis when considering NCAA restrictions. *See Smith*, 139 F.3d at 186. The challenged bylaws relating to regulating non-institutional summer camps are not "facially" anticompetitive. I find that there is no *per se* restraint and will apply rule of reason analysis.

To repeat, the first step in applying the rule of reason requires that the plaintiffs demonstrate that a competitive restraint has had substantial adverse, anti-competitive effect. To meet this initial burden, plaintiffs must prove: (1) that the defendants contracted, combined or conspired among each other;[20] (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Rossi*, 156 F.3d at 464–465. Plaintiffs may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods or services. *Brown Univ.*, 5 F.3d at 668.

■ The second step in plaintiffs' case, proving that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets, requires that plaintiff adequately define the relevant product and geographic markets. Plaintiffs have the burden of defining the relevant market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997). "The relevant market has both a product and a geographic component." *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01–4254, 2002 WL 31246922 at *5, 2002 U.S. Dist. LEXIS 15098 at *17 (E.D.Pa. Aug.9 2002). The relevant product market is defined as "those commodities reasonably inter-

tion." Irving Scher, ANTITRUST ADVISOR 1–16 (4th ed.2001).

19. The Supreme Court, explaining why a restraint imposed by the association should not be considered a *per se* antitrust violation, discussed the nature of the NCAA: "As Judge Bork has noted: 'Some activities can only be carried out jointly. Perhaps the leading example is league sports. When a league of professional lacrosse teams is formed, it would be pointless to declare their cooperation illegal on the ground that there are no other professional lacrosse teams.' R. Bork, The Antitrust Paradox 278 (1978). What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete." *Bd. of Regents*, 468 U.S. at 101, 104 S.Ct. 2948.

20. The parties have not addressed the first prong of this test, but there is no doubt that the promulgation of an NCAA bylaw is proof that the NCAA member institutions "contracted, combined or conspired among each other." *See Law*, 134 F.3d at 1016 (quickly disposing of this stage of rule of reason analysis by stating that the "NCAA does not dispute that the [challenged rule] resulted from an agreement among its members.")

changeable by consumers for the same purposes." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991) (citations omitted.) "The outer boundaries of a product market are determined by the reasonable interchangeability of use [21] or the cross-elasticity of demand [22] between the product itself and substitutes for it." *Queen City Pizza*, 124 F.3d at 436. "The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros.*, 952 F.2d at 726.

The pleading requirements for the antitrust plaintiff are strictly applied. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

Plaintiffs claim they plead the relevant market in their complaint by defining the relevant product market as summer basketball camps and the geographic market as the United States of America. In their sur-reply, plaintiffs state for the first time that "nothing is reasonably interchangeable with summer basketball camps" and that defendant's argument to the contrary is "absurd". (Pl. Sur–Reply 29.) As we are now at the summary judgment stage, plaintiffs should have brought forth evidence to support their market definitions. Plaintiffs have not alleged specific facts or brought forth evidence establishing that the market for summer basketball camps is distinct from the market for other kinds of summer camps, or from camps run during the academic year. There are no allegations in the complaint, nor any evidence relating to the price of or demand for summer basketball camps. Thus, plaintiffs have not alleged or proven whether there are reasonably interchangeable alternatives for their product. Defendant has suggested that many prospective basketball summer camp attendees would consider other kinds of athletic camps reasonable substitutes for basketball summer camp, and would also consider basketball camps run during the school year as reasonable alternatives.

21. "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." *Queen City Pizza*, 124 F.3d at 437 (citations omitted).

22. The Third Circuit has explained the term "cross-elasticity of demand" in the following ways: "Cross-elasticity is a measure of reasonable interchangeability. As one treatise observes: "The economic tool most commonly referred to in determining what should be included in the market from which one then determines the defendant's market share is cross-elasticity of demand. Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." " *Queen City Pizza*, 124 F.3d at 438, n. 6 (quoting E. Thomas Sullivan and Jeffrey L. Harrison, *Understanding Antitrust and its Economic Implications* 217 (1994).) "[T]he products in a relevant product market would be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Tunis Bros.*, 952 F.2d at 722.

Without plaintiffs properly setting forth a relevant product market, a court cannot conclude that the proposed market of summer basketball camps is a separate and distinct market, and therefore a relevant market for antitrust purposes. *See Brotech Corp. v. White Eagle Int'l Tech. Group, Inc.*, No. Civ. A. 03–232, 2003 WL 22797730, 2003 U.S. Dist. LEXIS 21073 (E.D.Pa. Nov.18, 2003), *Fresh Made, Inc.*, No. Civ. A. 01–4254, 2002 WL 31246922, 2002 U.S. Dist. LEXIS 15098 (E.D.Pa. Aug.9, 2002) (both cases dismissing plaintiff's federal antitrust claims for failure to plead a relevant market.) Therefore, plaintiffs have failed to adequately set forth the relevant market, which is another reason that the § 1 claim fails.

## IV. SHERMAN ACT § 2

 Plaintiffs also bring a claim under § 2 of the Sherman Act, which provides that: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2 (2004). "The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Queen City Pizza*, 124 F.3d at 437. Thus, like a claim under § 1 of the Sherman Act, a "court must inquire into the relevant product and geographic market and the defendant's economic power in that market." *Id.* at 442. I have already determined that plaintiffs' claim under § 1 of the Sherman Act must be dismissed for failure to plead a relevant market, and I will dismiss their claim under § 2 of the Sherman Act for the same reason. *See Queen City Pizza*, 124 F.3d at 441 (dismissing a monopoly claim for failure to plead a valid relevant market.) [23]

## V. TORTIOUS INTERFERENCE WITH CONTRACT

In addition to their antitrust claims, plaintiffs have alleged that defendant has

23. Even if plaintiffs had plead a valid relevant market, it is highly unlikely that their monopoly claim would have been successful. Plaintiffs brought this claim under the "essential facilities doctrine," which holds that: "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, — U.S. —, —, 124 S.Ct. 872, 879, 157 L.Ed.2d 823 (2004). To establish the necessary elements of an "essential facilities claim," plaintiffs must show: (1) control of the essential facility by the monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir.1996). Given that four plaintiffs conceded that Division I coaches were not necessary to the operation of summer basketball camps, it would have been extremely difficult for plaintiffs to prove that defendant's control of Division I coaches constituted an "essential facility." Furthermore, the Supreme Court recently issued a decision that calls the use of the doctrine into question except in the most extreme cases: "We have never recognized [the essential facilities] doctrine, and we find no need either recognize it or to repudiate it here. It suffices for present purposes to note that the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose." *Verizon Communications Inc.*, 124 S.Ct. at 881 (citations omitted).

tortiously interfered with plaintiffs' "contractual arrangements and prospective contractual arrangements with parents/guardians of high school basketball players who wish to send their sons and daughters to summer basketball camps, and with locations where such camps are conducted each year." (Cmplt. ¶ 86.) Plaintiffs further allege that defendant was aware of these arrangements and that defendant "deliberately and maliciously adopted regulations to minimize (and ultimately eliminate) the period of time during which Division I basketball coaches may observe and evaluate players at private basketball camps." (Compl.¶ 87.)

■ Defendant argues that this claim must be dismissed because plaintiffs have not brought forth any evidence about the specific contracts with which they claim defendant tortiously interfered. "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Because plaintiffs have brought forth no evidence supporting their claim for tortious interference, this claim is dismissed.